F. F. DAVIDSON and Rosa M. Davidson, Plaintiffs,

v.

Laurie W. TOMLINSON, District Director of Internal Revenue, District of Florida, Defendant.

Civ. A. No. 3609.

United States District Court S. D. Florida, Jacksonville Division.

July 23, 1958.

Final Judgment Aug. 6, 1958.

William R. Frazier, Jacksonville, Fla., for F. F. Davidson.

Edith House, Asst. U. S. Atty., Jacksonville, Fla., George Elias, Jr., Washington, D. C., for defendant Laurie W. Tomlinson.

SIMPSON, District Judge.

This suit for the recovery of personal income taxes and interest thereon was tried to the Court without a jury. From the pleadings, exhibits, testimony and argument of counsel, the Court makes the following

### Findings of Fact

1. The plaintiffs are individuals with residence in the City of Jacksonville, Florida.

2. The defendant is a citizen of the State of Florida, residing in the City of Jacksonville, and was at all times herein mentioned the duly appointed, commissioned and acting District Director of Internal Revenue for the District of Florida.

3. This action is one to recover personal income taxes and interest thereon erroneously or illegally assessed and collected without authority under the Internal Revenue laws of the United States.

4. The plaintiffs filed with and in the office of the then Collector of Internal Revenue for the District of Florida, and also in the office of the District Director of Internal Revenue for the District of Florida, both at Jacksonville, Florida, their personal income tax returns, Treasury Form 1040, for the calendar years 1950 through 1953, inclusive, within the time prescribed by law and duly paid the said Collector and the said District Director the income tax shown on the said returns to be due and owing by the plaintiffs to the United States Government.

5. That during the year 1955, the Commissioner of Internal Revenue as-

sessed the following income tax deficiencies and interest thereon against the plaintiffs for the calendar years 1950 through 1953, inclusive, as follows:

| Year | Deficiency | Interest | Total Assessment |
|---|---|---|---|
| 1950 | $ 887.95 | $ 245.64 | $ 1,133.59 |
| 1951 | 4,595.74 | 995.64 | 5,591.38 |
| 1952 | 8,641.98 | 1,353.71 | 9,995.69 |
| 1953 | 3,920.21 | 378.86 | 4,299.07 |
| | | | $21,019.73 |

6. That on the dates of November 9 and December 5, 1955, respectively, the plaintiffs paid the said total assessment in full in the amount of $21,019.73. That on or about February 28, 1956, plaintiffs filed with the District Director of Internal Revenue for the District of Florida, Jacksonville, claims for refund for the calendar years 1950 through 1953, inclusive, in the respective amounts set forth hereinbelow plus interest of income tax deficiencies and interest thereon paid for the calendar years as follows:

| Year | Date Filed | Amount of Claim |
|---|---|---|
| 1950 | February 28, 1956 | $1,133.59 |
| 1951 | February 28, 1956 | 5,591.38 |
| 1952 | February 28, 1956 | 9,995.69 |
| 1953 | February 28, 1956 | 4,299.07 |

7. More than six months had elapsed since the date upon which plaintiffs filed said claims for refund before instituting this suit, and the Commissioner had failed to act with respect to said claims, or any of them.

8. U-Drive Autos was a co-partnership between Rosa M. Davidson and Finney P. Lynch and had its principal office with principal place of business in Jacksonville, Florida. Sometime during 1954, the name of U-Drive Autos was changed to that of National Car Rentals, and all reference hereinafter to National Car Rentals shall include U-Drive Autos. During the years 1950 through 1953, inclusive, National Car Rentals was engaged in the business of leasing automobiles and trucks to the general public in the City of Jacksonville, Florida, and the Road Patrol of Duval County.

9. The Commissioner in auditing the plaintiff's personal income tax returns for the years 1950 through 1953, inclusive, made an adjustment reclassifying the long-term capital gain realized from the sale of rental automobiles and trucks by the partnership of National Car Rentals as ordinary income. This adjustment resulted in increasing plaintiff's ordinary income and decreasing the long-term capital gain reported on their original returns, which adjustment is shown in the report of the Examining Agent dated August 8, 1955, a copy of which was attached to plaintiff's claims for refund, as follows:

| Year | Increase of Ordinary Income | Decrease of Capital Gain |
|---|---|---|
| 1950 | $ 2,491.78 | $ 1,245.89 |
| 1951 | 11,551.32 | 5,775.66 |
| 1952 | 20,614.88 | 10,307.43 |
| 1953 | 9,542.20 | 4,771.10 |

The Commissioner made no adjustments to the partnership returns, Form 1065, filed by National Car Rentals for the years involved.

10. With respect to the calendar year 1950, the Commissioner increased the plaintiffs' interest income by the amount of $270.44 and decreased their long-term capital gain realized on the liquidation of Miami Auto Rentals of Miami, Florida, by the amount of $597.82, neither of which adjustments are at issue in this suit. The balance of the deficiency for 1950 and all of the deficiencies for the years 1951 through 1953, inclusive, arise solely from reclassifying the gain realized from the sale of said rental units by National Car Rentals from capital gain to that of ordinary income.

11. The business of National Car Rentals was managed by George A. Wilcox from July of 1948 until May of 1951, and Harry Ashball was the manager until sometime in 1952, when John C. Acker took over the position. It was the custom of National Car Rentals to pay its managers on the basis of a fixed salary and year-end bonus arrangement.

12. National Car Rentals maintains its office at 426 West Adams Street, Jacksonville, Florida. Sometime after Mr. Acker took over management of the business, it joined a non-profit organization known as The National Car Rental System which is similar to the Hertz and Avis Corporations, who were its competitors. During the year 1954, the name of the business was changed from U-Drive Autos to National Car Rentals. National Car Rentals during the period of Mr. Acker's employment also operated under the trade name of National Truck Rentals.

13. National Car Rentals during the years in question engaged in the business of renting automobiles and trucks to the general public on a daily, weekly, monthly or yearly basis. Also, during the years in question, the business leased a number of cars on an annual basis for use by the Duval County Road Patrol.

14. National Car Rentals had issued a number of credit cards to its customers and potential customers in the Jacksonville area, and also honored the holders of credit cards issued by the National office of the National Car Rental System. The National Car Rental System authorized its members to adopt its name for purposes of local operations. National Car Rentals paid dues and assessments to the National Car Rental System for the privilege of belonging to the organization.

15. No right was given the lessee to purchase any of the National Car Rentals cars or trucks, nor did the lessee acquire any interest in the leased equipment.

16. National Car Rentals maintained no inventory or stock of automobiles or trucks. The business always used Ford cars and trucks which it purchased from Lynch-Davidson Motors, Inc. These cars were sold to National Car Rentals by Lynch-Davidson Motors on a wholesale basis of the seller's delivered cost plus approximately $35. National Car Rentals purchased its cars and trucks only as it had need to fulfill the requirements of its business. In instances where cars or trucks were leased on an annual basis, a unit was not purchased until the lease had actually been signed with the lessee.

17. Lynch-Davidson Motors, Inc., is a Florida corporation with principal office at Jacksonville, Florida, and is a franchised Ford automobile dealership. During the period in question, the stock of Lynch-Davidson Motors, Inc., was owned equally by F. F. Davidson, one of the plaintiffs herein, and Hal L. Lynch, the husband of Finney P. Lynch, the co-owner and partner of National Car Rentals.

18. The rental business of National Car Rentals was somewhat seasonal in that its volume increased during the months of December through April when more tourists were coming to Florida. As the tourist season progressed, National Car Rentals would buy such additional cars and trucks as might be needed to handle the demand for rental service. After the winter season, the business would contract somewhat, and if there were surplus or idle rental units on hand,

they would be disposed of by the company's manager.

19. National Car Rentals had on hand at the end of the years 1950 through 1953, inclusive, the following number of rental cars and trucks:

| Year | Number of Rental Units |
|------|------------------------|
| 1950 | 64 |
| 1951 | 68 |
| 1952 | 79 |
| 1953 | 74 |

[a] 20. National Car Rentals gross rental income for the years involved was as follows:

| Year | Rental Income |
|------|---------------|
| 1950 | $115,057.29 |
| 1951 | 126,257.95 |
| 1952 | 125,470.02 |
| 1953 | 144,777.28 |

21. National Car Rentals because of competitive conditions in its business was compelled to have current model cars available for lease to its customers at all times. It kept most of its cars in service for approximately one year, although some were kept longer and some less than this period of time. Also, rental units were removed from service which had been wrecked or which had been run excessive mileages, or where the units were rundown or in bad condition. Trucks were kept in service several years and in some instances, three years or more. National Car Rentals faced strong opposition from its competitors in Jacksonville, and it was one of the smaller rental operations in this community.

22. The manager of the company handled the purchase of all cars and trucks and the disposition thereof when they were removed from service. During the year 1950 and continuing until sometime in May of 1951, when George A. Wilcox was manager of National Car Rentals, substantially all of the rental vehicles which were sold were disposed of in wholesale transactions to used car dealers located outside of the State of Florida, except that in some instances, a few sales were made directly to individuals who were desirous of purchasing a car or truck. This phase of the business was handled in substantially the same manner, while Harry Ashball, the former bookkeeper, acted as manager. After John C. Acker took over as manager sometime in 1952, the practice was followed of disposing of approximately 50% of the used rental units to out-of-state buyers in wholesale transactions, and the balance of the sales were handled through Lynch-Davidson Motors, Inc. As these rental units were withdrawn from service, they were taken to one of the two used car lots maintained by Lynch-Davidson Motors, Inc., which company would sell the cars and remit to National Car Rentals the net proceeds of the sale after deducting any repair expense and salesmen's commissions, if any, were paid. Mr. Acker handled the balance of these sales to the out-of-state buyers directly, and Lynch-Davidson Motors was not involved in these transactions.

23. Cars and trucks used in the rental business in Florida carry what is known as an "E" license tag and the title certificates are stamped "For Hire". This type registration has the effect of reducing the market value of these cars if they are sold in Florida, because the buyers thereof will be advised that the cars have been used in the rental business as opposed to private or non-commercial usage. The "E" tag costs National Car Rentals approximately twice the amount as opposed to an ordinary private tag. The used car dealers in the adjoining states could re-title the cars and sell them to better advantage where it would not be apparent that they had been used in the rental car business.

24. All of the rental units in service were covered by public liability and property damage insurance and also fire and theft. The company did not carry collision insurance, since the cost was deemed prohibitive.

25. During some of the years involved, National Car Rentals had its own mechanic and made most of its casual

repairs to the rental units at its Adams Street location. It also had its own bookkeeping department. Lynch-Davidson Motors, Inc. and National Car Rentals operated from entirely separate places of business.

26. National Car Rentals did not have a sales force selling its used rental units, nor did it have a showroom, used car lot, storage facilities or other selling facilities for the purchase and sale of new or used automobiles and trucks. The company was licensed by the state and county to engage in the rental car business. The company did not engage in the regular business of buying and selling automobiles, other than to dispose of the rental units after they were no longer needed for service, or new models had come on the market, or a car was wrecked or had been driven an excessive number of miles. The company never advertised any of the cars for sale in newspapers or in any other manner. Generally, the managers were acquainted with the used car buyers in adjoining states, and they would be contacted when there were a number of units available for sale, and the used car buyers would buy quite a few cars at a time from the company.

27. At the expiration of a rental contract, the customer would return the car to the company's place of business or possibly leave it with an associate member of the National Car Rental System out of town who would eventually return the car to Jacksonville. The primary purpose for National Car Rentals acquisition, use and disposition of its rental automotive equipment was directed to the operation of a vehicle rental business, and not a vehicle sales business.

28. During the years in question, National Car Rentals realized the following sums from the disposition of rental units held for more than six months:

| Year | Amount |
| --- | --- |
| 1950 | $ 4,983.56 |
| 1951 | 23,092.24 |
| 1952 | 41,229.76 |
| 1953 | 19,084.40 |

29. National Car Rentals depreciated its rental cars and trucks (other than Patrol cars) on the straight line method, utilizing an estimated useful life of three years with a $50.00 salvage value. The cars leased to the Duval County Road Patrol were depreciated on an estimated useful life of 24 months. The Court finds these methods and rates to be reasonable and fair.

Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter of this action.

2. The rental cars and trucks in question were held by National Car Rentals primarily for use in its rental vehicle business and were not held primarily for sale to customers in the ordinary course of trade or business within the meaning of Section 117(j) of the 1939 Code, 26 U.S.C.A. § 117(j). See Philber Equipment Corporation v. Commissioner, 3 Cir., 1956, 237 F.2d 129; United States v. Bennett, 5 Cir., 1951, 186 F.2d 407; Smith v. Commissioner, 5 Cir., 1956, 232 F.2d 142; Latimer-Looney Chevrolet Company, Inc. v. Commissioner, 1952, 19 T.C. 120.

3. The plaintiffs are entitled to treat their distributive share of the gains realized by National Car Rentals from the sale of the cars and trucks in question, which had been held for more than six months at the date of sale, in their personal returns as long-term capital gain under the provisions of Sections 117(a) and 117(j) of the 1939 Code.

4. National Car Rentals is entitled to an allowance for depreciation of its rental cars and trucks for the years involved as shown by the original partnership tax returns, Form 1065, filed for the years 1950 through 1953, inclusive, under the provisions of Section 23(l) of the 1939 Code, 26 U.S.C.A. § 23(l).

5. During the calendar year 1950 the plaintiffs realized additional interest income in the amount of $270.44 and a de-

crease in long-term capital gain realized on the liquidation of Miami Auto Rentals of Miami, Florida, of $597.82, as determined by the Commissioner and conceded by counsel.

6. The parties are directed to settle decree accordingly, the Court having been advised at the hearing that counsel have agreed to compute the amount of refund to which plaintiffs might be entitled and to submit same to the Court together with a proper form of judgment to be entered in this cause.

## Final Judgment

This cause came on to be heard before the Court without a jury on April 8, 1958, in Jacksonville, Florida, and the Court having heretofore made its findings of fact and conclusions of law directing judgment for the plaintiffs in the total amount of $21,019.73 in accordance with an agreed computation between the respective parties hereto being the income tax deficiencies and interest thereon paid by the plaintiffs for the taxable years 1950 through 1953, inclusive, as follows:

| Year | Refund of Tax | Deficiency Interest | Overpayment |
|------|--------------|---------------------|-------------|
| 1950 | $ 887.95 | $ 245.64 | $ 1,133.59 |
| 1951 | 4,595.74 | 995.64 | 5,591.38 |
| 1952 | 8,641.98 | 1,353.71 | 9,995.69 |
| 1953 | 3,920.21 | 378.86 | 4,299.07 |
| | | Total | $21,019.73 |

Whereupon, upon consideration thereof, it is

Considered, Ordered and Adjudged that the plaintiffs recover the sum of $21,019.73, together with interest thereon at the rate of six (6%) per cent per annum as allowed by law, to a date preceding the date of the refund check by not more than thirty days and costs in the amount of $17.10.

The Court hereby certifies that there was probable and reasonable cause for the acts of the defendant, Laurie W. Tomlinson, District Director of Internal Revenue, District of Florida, in demanding and collecting from the plaintiffs the income tax and interest for the refund of which this judgment is entered.