Ralph J. CEBRIAN, A. K. Tichenor and Thomas A. Allan, Trustees of the Bondholders Committee, West Sacramento Company

v.

UNITED STATES.

No. 292–56.

United States Court of Claims.

March 2, 1960.

Valentine Brookes, San Francisco, Cal., for plaintiffs. Arthur H. Kent, Paul E. Anderson, and Kent & Brookes, San Francisco, Cal., on the briefs.

Harold S. Larsen, Washington, D. C., Acting Asst. Atty. Gen. Howard A. Heffron, for defendant. James P. Garland and Lyle M. Turner, Washington, D. C., on the brief.

LARAMORE, Judge.

Plaintiffs sue to recover income taxes paid for the tax years 1946 through 1950, and excess profits taxes paid for 1950, together with deficiency interest paid thereon. The amount claimed is $169,277.20, plus interest as provided by law.

Fiduciary income tax returns had been filed for the years in question, and the deficiencies were based on a redetermination of plaintiffs' tax liability which asserted that the plaintiffs were taxable as an association under section 3797(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3797(a), and that the amounts of the net gain realized on the sale of certain real estate were ordinary income, and not gains derived from the sale of capital assets within the meaning of section 117(a) of the 1939 Code, 26 U.S.C.A. § 117(a).

The deficiency assessments were all paid on May 14, 1953. Claims for refund were timely filed, and this suit was timely brought after the claims were denied.

The plaintiffs are, and during the years here involved were, the successor trustees of the Bondholders' Committee of the West Sacramento Company, a California corporation organized in 1910 for the purpose of acquiring and developing real estate and for related business purposes. In 1910 the company mortgaged all of its property then owned or afterward acquired to secure the payment of an authorized bond issue of $2,000,000. The bonds were issued for a 20-year term and carried an interest rate of six percent per annum. In all, the company eventually acquired approximately 10,000 acres of land in the West Sacramento area.

Soon after the company had commenced operations, it was instrumental in the creation of Reclamation District No. 900, Yolo County, as a political subdivision. With the exception of some riverbank lots, all of the company's lands were located in the district. After being established, the district sold reclamation bonds totaling $1,500,000 which were secured by a lien on the lands within the district. This lien was superior to the bondholders' lien.

The company began developing its lands by subdividing, building roads, installing streets, etc. The development program was cut short in 1913 when the company started having financial troubles. By 1919 a series of seven assessments amounting to $25 per share had been levied against the stockholders. Some stockholders permitted their stock to be forfeited to the company.

After the company's default, the bondholders were given the right to exchange their bonds for land of the company. Between 1914 and 1922, a number of the bondholders exercised this right and acquired the better parcels of the company land. Of the 2,000 bonds originally issued, only 703 were outstanding on January 1, 1922.

By 1922 the company was hopelessly insolvent. The delinquent obligations of the company that were prior to the lien of the bondholders totaled $389,818.14. The principal amount of the bonds outstanding at that time was $703,000, creating a total debt currently payable of $1,092,818.14. The stockholders of the company themselves recognized the insolvency of the company and proposed a plan of reorganization to the bondholders which was rejected.

In June 1922 the bondholders adopted a plan of reorganization under which a committee was named to commence foreclosure proceedings against the company.

The plan of reorganization called for each participating bondholder to deposit his bonds plus $200 cash per bond with the Mercantile Trust Company, the trustee under the bond indenture. The reorganization plan became effective with the deposit of 661 bonds together with cash of $132,200.

The formal reorganization agreement, dated June 15, 1922, was approved by a bondholders' protective committee and signed by a reorganization committee, was executed by the Mercantile Trust Company as trustee under the bond indenture, and accepted by the holders of 661 bonds. The powers and duties of plaintiffs as successor trustees, as well as those of their predecessor trustees, are derived from this agreement, which reads in part as follows:

"*Seventeenth*: In the event that the Committee shall purchase, or cause to be purchased, the said property, or any thereof, at any sale thereof under a decree in the said suit of foreclosure, or under a decree in any other judicial proceedings for the foreclosure of the said mortgage or deed of trust, or under the power of sale provided in the said mortgage or deed of trust, the Committee, upon the conveyance to or for the Committee of the said property so purchased, shall manage the said property either directly or through a corporation which may be incorporated by the Committee for that purpose, and shall sell and convey, or cause to be sold and conveyed, the said property, in such lots or parcels as the Committee may deem to be advisable, and for such prices therefor as the Committee shall deem to be adequate, but not less than the fair market value thereof, and shall sell the said property as rapidly as the same can reasonably be sold. The said sales may be made for prices payable, in part, in deferred installments, either under contracts of sale, or evidenced by notes of the purchasers therefor secured by mortgages of the property sold, and

on such terms and conditions as to times of payment, rate of interest, and otherwise, as the Committee may deem to be advisable.

"The said property so purchased, until the same shall be sold or caused to be sold by the Committee, may be leased by or cropped for the Committee under such leases and cropping contracts as the Committee may deem to be appropriate, or if the Committee shall deem it advisable to do so, the said property, or parts thereof, may be farmed or otherwise operated by or for the Committee."

Under the terms of the reorganization agreement the liability of the bondholders for the acts of the committee or any member of the committee, other than for willful misconduct, was unlimited. The bondholders' liability for the acts of the committee and its members extended not only to contractual matters but also to liabilities incurred which arose out of negligence, omission to act, or other torts.

Pursuant to the reorganization agreement, Mercantile Trust Company accelerated the maturity date of the deed of trust securing the bonds and brought suit to foreclose. The property was sold under court decree to the bondholders (owners of 661 bonds) who participated under the reorganization plan for a foreclosure sale price of $281,137.76. No other bids were made for the property at the foreclosure sale. The 42 nonparticipating bondholders received a total of $10,571.82 in cash, and their lien as bondholders was extinguished.

The property acquired by the bondholders under the foreclosure proceeding was conveyed to the individual members of the committee named in the reorganization agreement.

The company ceased doing business after the foreclosure proceedings. On February 7, 1923, a deficiency judgment was entered in the foreclosure proceedings against the company in the sum of $946,811.27. The company was suspended by the California Secretary of State on March 1, 1924, for failure to pay franchise taxes.

Of the approximately 10,000 acres acquired by the company, only 2,606.76 acres and 235 lots remained at the time of foreclosure and were acquired by the participating bondholders in the names of their trustees. The property other than the 235 lots was described by metes and bounds and consisted of 67 parcels for the purpose of property description, scattered over an area of almost 28 square miles.

The foreclosed lands could not have been readily sold to one party or in one sale, and it was not possible to develop them as one unit. About 750 acres of the land were undesirable for farming purposes as 600 acres were covered with sand, and 125 to 150 acres were covered with trees. Another portion was unusable because it consisted of a levee right-of-way on the boundary of the reclamation district.

Because of geographical factors and local prejudice against the area, the bondholders' lands were poor for purposes of development and residential sales.

The pertinent lands, being within the reclamation district, were burdened by a heavy reclamation bond lien. At the time of the foreclosure this bonded indebtedness averaged $150 per acre, which in some cases was in excess of the value of the land. Reclamation district lands had a bad reputation throughout California on account of such liens and assessments, and many farmers would not consider purchasing such lands. At the time of the foreclosure a farm depression existed in the area, and there was not much demand for farming land.

After foreclosure the bondholders made every effort to find a purchaser who would buy all of the properties at a reasonable price. These efforts to sell the whole were unsuccessful. The committee then began to sell the land in small parcels.

Pending the sale of lands, the land suitable for farming was leased out whenever possible. A number of acres of the wooded portions of land were cleared by the tenants in exchange for the use of the land. Lease income for the periods 1922–1941 and 1947–1950 was not sufficient to cover the carrying charges on the lands.

The life of the original committee organized under the plan of reorganization was limited to five years. In 1927 the bondholders voted to continue the terms of the reorganization agreement and appointed successor trustees for an additional five years. The same was done in 1932, 1937, 1942, and 1947, and ever since that time the plaintiffs have been the duly constituted committee under the extended reorganization agreement.

From 1930 to 1937 there was very little demand for the bondholders' lands for farming use and no demand for the lands for possible subdivision use.

In early 1932 the bondholders were faced with the probability of defaulting on their assessment for the payment of the reclamation bonds maturing on January 1, 1933. The anticipated default was avoided by the refinancing of the reclamation bonds for another 5 years. By this time the reclamation indebtedness had been reduced to an average of $65 per acre of land.

In 1932 the committee was also faced with a default on real estate taxes and assessments for interest and maintenance charges by the reclamation district. As of the end of March 1932, the committee's cash on hand was only $943.-65; its anticipated revenues to June 30, when $14,364.80 of taxes and assessments would be due, was only an additional $5,200. These taxes and assessments were in fact in default for a period of time but were paid as delinquent taxes before 1937. In the period of the depression it was impossible to borrow money on lands located in the West Sacramento area.

In 1937 the committee paid its first distribution to the bondholders of $20 per bond, which represented a partial repayment of the $200 per bond advanced by the bondholders at the time of foreclosure 15 years earlier.

Accessibility to the bondholders' lands from Sacramento was improved in 1935

by the construction of a new bridge. From 1937 to World War II a number of other improvements occurred that made the bondholders' lands more desirable.

Yolo County extended Park Boulevard from the bondholders' lands to the Davis Highway and opened up Michigan Boulevard. In 1937 the bondholders' committee interested Clyde W. Henry in coming into the area to provide water service as an independent public utility bearing the name, West Sacramento Water Company. The committee was endeavoring to satisfy requirements of the Federal Housing Administration as to water supply. The committee transferred all of its wells, piping and other properties to the water company and also paid over $4,500 in cash, of which $3,000 was later recovered by suit. A street lighting district was formed in West Sacramento City-Unit One and the county put in street lights. Also a sanitary district was formed by election to provide for sewers in the area. The bondholders contributed $500 to a $1,500 fund to pay attorneys' fees and expenses incident to the organization of the district. Fire protection in the area was provided by a fire district.

During World War II, home building was halted and the demand for the bondholders' lands for residential purposes was not great. Some sales were made, but during this period most of the trust income was from leasing.

The first payment for the services of the committee members was authorized and paid starting in 1943 for services rendered from 1922 to the date of payment. This payment was not made until after the final $25 per bond payment was made to repay the $200 per bond advanced by the bondholders at the time of foreclosure. This payment occurred in 1943. The committee made the first payment on bond principal, which consisted of a total of $200 per $1,000 bond, by the end of 1945.

The year 1946 marked the turning point in the committee's efforts to dispose of the bondholders' lands. Sales of land during the period 1946–1950 greatly in-creased. Of the 2,606.76 acres of land (1,951.87 of which was unsubdivided farmland), and 235 lots acquired by the bondholders at the foreclosure in 1922, about half the acreage and 233 of the lots had been sold by the end of 1950. Almost half of the acreage sold was sold during the 1946–1950 period.

By the end of 1950 the bondholders had received repayment of the $200 per bond advanced by them to finance the reorganization agreement plus $500 of the $1,000 principal of each bond. In all this period from 1922 through 1950 no payment was made for interest on the bonds.

At no time during the period from the date of foreclosure to the end of 1950 did the committee delay disposition of the bondholders' lands in the hope of a speculative increase in prices in the future. At all times the committee was willing to sell the bondholders' lands if a fair price, based upon conditions existing at the time of sale, were offered. The committee would not, however, sell any land for less than its appraised value at the time of foreclosure. During the period 1946 through 1950 inclusive, no sales were turned down because the prices were inadequate.

During the entire period 1922 to 1950 no additional property was purchased except for a 30-foot right-of-way which had formerly belonged to the bondholders and was repurchased by them in order to clear up land titles of the adjacent properties.

Sometime during the period 1922 to 1929, the committee at the insistence of the health authorities, had a deeper well drilled to provide better water. This improvement cost $20,000. In 1937, at the request of a real estate broker who had approached the committee with a plan for a new subdivision, and to whom it had given the exclusive sales agency for the sale of lots in the subdivision, the committee filed a subdivision map. Minor improvements such as the leveling and graveling of four streets, at a cost of between $2,000 and $3,000, were made in the subdivision.

In 1941, the committee joined with other owners to file a resubdivision which made certain lots more desirable. The sum of $10,000 was spent for minor street improvements in the resubdivided area. Although the committee had decided in 1941 to cease work of a developmental nature, it spent $3,393.50 in 1946 for land leveling which resulted in the reclamation for the bondholders of 12 acres of previously unusable land.

The record does not indicate that the committee engaged in sales activities during the 1922 to 1936 period. In 1937, the committee turned over the selling of its land to Arthur F. Turner on a commission basis. Although Mr. Turner, a licensed real estate broker since 1931, and a holder of 100 bonds that he started purchasing in 1936, was employed by the company in 1913 as a bookkeeper, and has been employed by the committee since the foreclosure as its lease manager or superintendent, his real estate brokerage business was entirely independent of the business of the committee and the committee had no right and made no attempt to supervise this business.

With respect to the selling of bondholders' lands, Mr. Turner conducted a sales effort through limited advertising in the local newspapers, and also employed salesmen. He paid such sales expenses as a part of the operation of his own business, and was not reimbursed by the committee except through the payment of commissions on accomplished sales.

Prior to 1946, Mr. Turner commenced a program of real estate development independent of the business of the committee, including the building and selling of approximately 2,000 houses. His activities were confined to the West Sacramento area, and hence he operated under the assumed name of West Sacramento Land Company.

In 1946 the committee sold 76 parcels of land to 56 different purchasers; in 1947, it sold 62 parcels to 45 purchasers; in 1948, it sold 60 parcels to 41 purchasers; in 1949, it sold 28 parcels to 19 purchasers; and in 1950, it sold 29 parcels to 19 purchasers.

One of the sales in 1947 was of 30.126 acres to Turner and one Williams for the development of a new subdivision known as Linden Acres. The area was subdivided and developed solely by Turner and Williams. Because Turner and Williams did not have legal title to the property at the time the subdivision map was filed, the signatures appearing on the map are those of the committee members.

Other purchases were made by the partnership of Turner and Williams in 1948 and 1950. Turner, individually, made purchases of the bondholders' lands in 1947, 1948, 1949, and 1950.

The sales of the lands of the bondholders by the committee and trustees were handled in a manner different from that of a real estate developer. The established policy not to expend funds for developments, and to make sales at a price less than that which would have been obtained by a developer willing to expend capital for improvements, is evidenced by one transaction in 1950 in which the trustees sold slightly over 20 acres of land to the partnership of Turner and Williams for $18,765, which included taxes. Such property was developed as Westfield Unit No. 2, containing 110 lots, at a cost to Turner and Williams of about $70,000 for streets, sewers, water system, sidewalks, gutters, surveying and engineering. Additional expenses of this partnership of approximately $24,000 covered commissions to salesmen, advertising, conveying costs, overhead expenses, office expense, and miscellaneous expense. The total selling price realized by the partnership was $138,650, costs and expenses were $112,250, and the net profit was $26,400. These figures are typical of subdivisions of the same size in the West Sacramento area in the years 1946 through 1950.

The net gain (sale price less expenses of sale and basis) realized from the sale of lands was $87,704.62, in 1946; $138,016.49, in 1947; $106,377.39, in 1948; $70,797.68, in 1949; and $338,143.19, in

1950. Plaintiffs contend that these amounts should have received capital gains treatment, and that they did not constitute an association taxable as a corporation.

Thus the issues here involved are (1) whether the gain realized from the sale of the land is to be taxed as a capital gain from the sale of capital assets, or as ordinary income received from the sale of property held primarily for sale to customers in the ordinary course of a trade or business,[1] and (2) whether the plaintiffs constituted an association taxable as a corporation.[2]

■ Both questions number one, Boeing v. United States, Ct.Cl., 1958, 168 F. Supp. 762; Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263; Mauldin v. Commissioner, 10 Cir., 195 F.2d 714; and question number two, Fletcher v. Clark, 10 Cir., 150 F.2d 239, 166 A.L.R. 1456, certiorari denied 326 U.S. 763, 66 S.Ct. 144, 90 L.Ed. 459; Lucas v. Extension Oil Co., 5 Cir., 47 F.2d 65; Mullendore Trust Co. v. United States, 10 Cir., 271 F.2d 748; must be answered on the basis of the facts of this case.

■ With reference to the first question here involved, we have indicated that there is no single decisive test that can be applied in determining whether or not property is held primarily for sale to customers in the ordinary course of one's trade or business. Garrett v. United States, 120 F.Supp. 193, 128 Ct.Cl. 100. Among the factors we have regarded as important are the activities of the taxpayer, or his agents, in promoting sales, the extent of the development and improvement of the property, the purpose for which the property was acquired, and the frequency and continuity of sales. McConkey v. United States, 130 F.Supp. 621, 131 Ct.Cl. 690; Boeing v. United States, supra; Lazarus v. United States, Ct.Cl., 172 F.Supp. 421.

We think the purpose for which the property was acquired is clear. It was acquired to enforce a debt of a hopelessly insolvent corporation. Since no other bids were made for the property at the foreclosure, obtaining the property and then liquidating it was the only means the bondholders had of obtaining satisfaction of the debt.

The defendant contends that the purpose set out in the reorganization agreement to "manage, control and sell the land," is not substantially different from the objective and purpose of the original West Sacramento Company, which was to engage in the real estate business. The fact that the stockholders were also possible beneficiaries from the sale of the lands, is further evidence of this purpose in the defendant's eyes. We cannot agree with this interpretation. Considering the circumstances under which the property was acquired by the trustees, the directive to the trustees to sell the property "as rapidly as the same can reasonably be sold" evidences a purpose to liquidate the property for the

---

1. Internal Revenue Code of 1939:

"§ 117. Capital gains and losses—(a) Definitions.

"As used in this chapter— ·

"(1) Capital assets.

"The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *." 26 U.S.C. (1952 ed.) § 117.

2. Internal Revenue Code of 1939:

"§ 3797. Definitions

"(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

\* \* \* \* \*

"(3) Corporation. The term 'corporation' includes associations, joint-stock companies, and insurance companies.

\* \* \* \* \*

"(6) Fiduciary. The term 'fiduciary' means a guardian, trustee, executor, administrator, receiver, conservator, or any person acting in any fiduciary capacity for any person. * * *"
26 U.S.C. 1952 ed., § 3797.

benefit of the bondholders so that they might obtain satisfaction of the debt. The fact that the bondholders voluntarily made provision for the stockholders to share in the proceeds after they themselves had recovered on their debts is indicative of a purpose to obtain satisfaction of a debt, and not to engage in the real estate business.

The fact that the word "liquidation" was not used in the reorganization agreement does not nullify the bondholders' intent to liquidate, it simply renders that purpose a little less obvious. This is a situation where substance rather than form governs.

That it took the plaintiffs 28 years to liquidate but half of the committee's land holdings, does not of itself lead to the conclusion that plaintiffs were engaged in the real estate business. Alabama Mineral Land Company v. Commissioner, 5 Cir., 250 F.2d 870; Chandler v. United States, 7 Cir., 226 F.2d 403. This is especially true where the properties acquired on foreclosure are scattered over a large area and could not have been sold in one transaction. Alabama Mineral Land Company v. Commissioner, supra.

The Government argues that the plaintiffs extended the period of time during which the sales of their land were made, because for many years there had been the prospect of the establishment of a port district in the area of their holdings which would have increased the value of such lands. This argument is not supported by the record. It was found that the plaintiffs never delayed disposition of the bondholders' lands in the hope of a speculative increase in future prices.

The Government further contends, citing Heiner v. Mellon, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337, and Home Co. v. Commissioner, 10 Cir., 212 F.2d 637, that sales in liquidation may nevertheless amount to carrying on a business. We recognized in Boeing v. United States, supra, that this might be the case, but we also indicated that the liquidation should be accompanied by extensive development and sales activity before such a conclusion is reached. As will be seen from the discussion that follows, we do not think that such extensive development and sales activity were here present.

The record does not indicate that plaintiffs engaged in any sales activities. During the tax years in question, all sales, other than those to public agencies and the broker himself, were handled through a real estate broker whose business was entirely independent of plaintiff's activities. The plaintiffs had no right, and made no attempt to supervise the sale of its lands. The broker paid all the expenses incurred in his sales effort, and was not reimbursed by the committee except through the payment of commissions on accomplished sales. Therefore, the activities of the broker, Mr. Turner, in promoting sales of the plaintiff's lands were not the activities of an agent of the plaintiffs. We have held in similar, and less-deserving situations that where little or no effort is made to sell real estate acquired by foreclosure, and being sold pursuant to liquidation, the sales were not in the ordinary course of the seller's trade or business. McConkey v. United States, supra; Gordon v. United States, 159 F.Supp. 360, 141 Ct. Cl. 883; Western and Southern Life Insurance Company v. United States, Ct. Cl., 163 F.Supp. 827.

The frequency and continuity of sales of the plaintiff's lands during the tax years in question were sufficient to hold, if we were basing our decision on this criterion alone, that the gains from the sale of the lands constituted ordinary income. Lazarus v. United States, supra; Brown v. Commissioner, 5 Cir., 143 F.2d 468, 470. However, as we pointed out above, no one test is determinative of the issue.

We do not view the developmental and improvement work done by plaintiffs on their lands as extensive. From the time the land was acquired by foreclosure in 1922, until 1945, approximately $32,500 was expended, $20,000 of which was for a deeper well that the health authorities insisted be drilled. The balance of

the monies expended during this period was for minor street improvements. The only expenditure of an improvement nature during the years in question was $3,393.50 for land leveling which resulted in the reclamation for the bondholders of 12 acres of previously unusable land.

Defendant contends that because of the above expenditures, because plaintiffs filed one subdivision map itself and joined with other land owners to file one, and because plaintiffs were instrumental in the formation of certain political districts whose activities enhanced the value of plaintiffs' lands, plaintiffs did in fact undertake extensive developmental work, and hence, were engaged in business. The record, however, does not show that plaintiffs were instrumental in the formation of the political districts. It simply shows that the districts were formed. The contention also flies in the face of the finding that the plaintiffs handled the sales of the lands in a manner different from that of a real estate developer.

The developmental work done by the plaintiffs was no more extensive than such work done in Garrett v. United States, supra; Gordon v. United States, supra; and Lazarus v. United States, supra, and in those cases we held that the taxpayers were entitled to treat gains realized from the sale of lands as capital gains.

It is contended by the defendant that the fact that plaintiffs did not reinvest proceeds from sales in additional property does not in itself mean that they were not engaged in business. We agree, but we also think that on the facts before us it is another indication that plaintiffs were not engaging in the real estate business.

On all the facts, we think that the plaintiffs were liquidating real estate acquired on foreclosure to enforce a debt, and were not engaging in the real estate business. They were therefore entitled to treat gains realized from the sale of such property as capital gains. On facts very similar to those of the instant case it has been so held. Alabama Mineral Land Company v. Commissioner, supra.

Having determined that plaintiffs were liquidating trustees of the bondholders' property, and were not engaged in the real estate business, it would be inconsistent to hold that they constituted an association taxable as a corporation under section 3797 of the 1939 Code.

 The 1939 Code does not define the word "association", so we must look to the case law and Treasury Department regulations for guidance. The cases treating this question are legion, and each one was decided on the basis of its own peculiar facts. Both the cases and the regulations [3] agree that one of the

---

**3.** Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939: "Sec. 29.3797–2. Association.—The term 'association' is not used in the Internal Revenue Code in any narrow or technical sense. It includes any organization, created for the transaction of designated affairs, or the attainment of some object, which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which, like corporate affairs, are conducted by a single individual, a committee, a board, or some other group acting in a representative capacity. It is immaterial whether such organization is created by an agreement, a declaration of trust, a statute, or otherwise. It includes a voluntary association, a joint-stock association or company, a 'business' trust, a 'Massachusetts' trust, a 'common law' trust, an 'investment' trust (whether of

the fixed or the management type), an inter-insurance exchange operating through an attorney in fact, a partnership association, and any other type of organization (by whatever name known) which is not, within the meaning of the Code, a trust or an estate, or a partnership. If the conduct of the affairs of a corporation continues after the expiration of its charter, or the termination of its existence, it becomes an association.

"Sec. 29.3797–3 Association Distinguished from Trust.—The term 'trust', as used in the Internal Revenue Code, refers to an ordinary trust, namely, one created by will or by declaration of the trustees or the grantor, the trustees of which take title to the property for the purpose of protecting or conserving it as customarily required under the ordinary rules applied in chancery and probate courts. The beneficiaries of such a trust

prime factors, if not the controlling one, to be considered in determining whether a trust is an association taxable as a corporation is the purpose for which the

generally do no more than accept the benefits thereof and are not the voluntary planners or creators of the trust arrangement. Even though the beneficiaries do create such a trust, it is ordinarily done to conserve the trust property without undertaking any activity not strictly necessary to the attainment of that object.

"As distinguished from the ordinary trust described in the preceding paragraph there is an arrangement whereby the legal title to a property is conveyed to trustees (or a trustee) who, under a declaration or agreement of trust, hold and manage the property with a view to income or profit for the benefit of beneficiaries. Such an arrangement is designed (whether expressly or otherwise) to afford a medium whereby an income or profit-seeking activity may be carried on through a substitute for an organization such as a voluntary association or a joint-stock company or a corporation, thus obtaining the advantages of those forms of organization without their disadvantages. The nature and purpose of a cooperative undertaking will differentiate it from an ordinary trust. The purpose will not be considered narrower than that which is formally set forth in the instrument under which the activities of the trust are conducted.

"If a trust is an undertaking or arrangement conducted for income or profit, the capital or property of the trust being supplied by the beneficiaries, and if the trustees or other designated persons are, in effect, the managers of the undertaking or arrangement, whether the beneficiaries do or do not appoint or control them, the beneficiaries are to be treated as voluntary joining or co-operating with each other in the trust, just as do members of an association, and the undertaking or arrangement is deemed to be an association classified by the Internal Revenue Code as a corporation. However, the fact that the capital or property of the trust is not supplied by the beneficiaries is not sufficient reason in itself for classifying the arrangement as an ordinary trust rather than as an association.

"By means of such a trust the disadvantages of an ordinary partnership are avoided, and the trust form affords the advantages of unity of management and continuity of existence which are characteristic of both associations and corporations. This trust form also affords the advantages of capacity, as a unit, to acquire, hold, and dispose of property and the ability to sue and be sued by stran-gers or members, which are characteristic of a corporation; and also frequently affords the limitation of liability and other advantages characteristic of a corporation. These advantages which the trust form provides are frequently referred to as resemblance to the general form, mode of procedure, or effectiveness in action, of an association or a corporation, or as 'quasi-corporate form'. The effectiveness in action in the case of a trust or of a corporation does not depend upon technical arrangements or devices such as the appointment or election of a president, secretary, treasurer, or other 'officer,' the use of a 'seal,' the issuance of certificates to the beneficiaries, the holding of meetings by managers or beneficiaries, the use of a 'charter' or 'by-laws,' the existence of 'control' by the beneficiaries over the affairs of the organization, or upon other minor elements. They serve to emphasize the fact that an organization possessing them should be treated as a corporation, but they are not essential to such classification, for the fundamental benefits enjoyed by a corporation, as outlined above, are attained, in the case of a trust, by the use of the trust form *itself*. The Internal Revenue Code disregards the technical distinction between a trust agreement (or declaration) and ordinary articles of association or a corporate charter, and all other differences of detail. It treats such a trust according to its essential nature, namely, as an association. This is true whether the beneficiaries form the trust or, by purchase or otherwise, acquire an interest in an existing trust. The mere size or amount of capital invested in the trust is of no importance. Sometimes the activity of the trust is a small venture or enterprise, such as the division and sale of a parcel of land, the erection of a building, or the care and rental of an office building or apartment house; sometimes the activity is a trade or business on a much larger scale. The distinction is that between the activity or purpose for which an ordinary strict trust of the traditional type would be created, and the activity or purpose for which a corporation for profit might have been formed.

"Sec. 29.3797–9. Fiduciary.—'Fiduciary' is a term which applies to persons who occupy positions of peculiar confidence toward others, such as trustees, executors, and administrators. A fiduciary for income tax purposes is a person who holds in trust an estate to which another has the beneficial title or in which another

trust was created.[4] If the trust arrangement is designed to afford a medium whereby an income or profit seeking activity may be carried on, it is an association taxable as a corporation. Where, as here, the trust form is used for the purpose of liquidation, the trustees do not constitute an association taxable as a corporation; they are taxable as fiduciaries. Broadway-Brompton Buildings Liquidating Trust, 34 B.T.A. 1089, acq. 1938–2 C.B. 4; George I. Fullerton, 22 T.C. 372, acq. 1955–1 C.B. 4; Nee v. Linwood Securities Co., 8 Cir., 174 F.2d 434.[5]

In Morrissey v. Commissioner, 296 U. S. 344, 56 S.Ct. 289, 80 L.Ed. 263, a leading case heavily relied on by the defend-

---

has a beneficial interest, or receives and controls income of another, as in the case of receivers. A committee or guardian of the property of an incompetent person is a fiduciary."

4. The Commissioner of Internal Revenue recently reiterated this with reference to the 1954 Code, when on December 23, 1959 he gave notice of his intention to issue the following regulations:

"§ 301.7701–2. Associations.—(a) Characteristics of corporations. (1) The term 'association' refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust. There are a number of major characteristics found in a pure corporation which, taken together, distinguish it from other organizations. These are: (i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be classified as an association must be determined by taking into account the presence or absence of each of these corporate characteristics. The presence or absence of these characteristics will depend upon the facts in each individual case. In addition to the major characteristics set forth in this subparagraph, other factors may be found in some cases which may be significant in classifying an organization as an association, a partnership, or a trust. An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See Morrissey v. Commissioner, 1935, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263.

"(2) Since associates and an objective to carry on business and divide the gains therefrom are essential characteristics of all business organizations (other than the so-called one-man corporation and the sole proprietorship), the absence of either of these essential characteristics is suf-

ficient to cause an organization not to be classified as an association. Some of the major characteristics of a corporation are common to trusts and corporations, and others are common to partnerships and corporations. Characteristics common to trusts and corporations are not material in attempting to distinguish between a trust and an association, and characteristics common to partnerships and corporations are not material in attempting to distinguish between an association and a partnership. For example, since centralization of management, continuity of life, free transferability of interests, and limited liability are generally common to trusts and corporations, the determination of whether a trust which has such characteristics is to be treated for tax purposes as a trust or as an association depends on whether there are associates and an objective to carry on business and divide the gains therefrom. On the other hand, since associates and an objective to carry on business and divide the gains therefrom are common to both corporations and partnerships, the determination of whether an organization which has such characteristics is to be treated for tax purposes as a partnership or as an association depends on whether there exists centralization of management, continuity of life, free transferability of interests, and limited liability." [24 Fed.Reg. 10451.]

5. The Commissioner also recently indicated agreement with this. His proposed regulations include the following:

"§ 301.7701–4 Trusts

\* \* \* \*

"(e) Liquidating trusts. Certain organizations which are commonly known as liquidating trusts are treated as trusts for purposes of the Internal Revenue Code. An organization will be considered a liquidating trust if it is organized for the primary purpose of liquidating and distributing the assets transferred to it, and if its activities are all reasonably necessary to, and consistent with, the accomplishment of that purpose. A liquidating trust is treated as a trust for purposes of the Internal Revenue Code

ant, the Supreme Court indicated agreement with this treatment when in holding the trust therein involved was an association taxable as a corporation, it said at page 361 of 296 U.S., at page 296 of 56 S.Ct.:

> " * * * It was not a liquidating trust; it was still an organization for profit, and the profits were still coming in. * * * "

Edgar Estates Corp. v. United States, 65 Ct.Cl. 415, which defendant also relies on, is distinguishable on two bases. First, the purpose there was to *acquire* and then to liquidate, and secondly, the tax there involved was the Federal capital stock tax (now repealed). We there held that since the plaintiffs had chosen the corporate form for their own benefit, the tax was properly imposed, even though the corporation was liquidating. Magruder v. Washington, Baltimore & Annapolis Realty Corp., 316 U.S. 69, 62 S.Ct. 922, 86 L.Ed. 1278, another case defendant relies on, is distinguishable for the same reason.

The Government contends that plaintiffs' leasing activities evidenced an intent to engage in business for profit. In Broadway-Brompton Buildings Liquidating Trust, supra, a case strikingly similar to the instant case factually, it was held that the leasing activity of the trust pending liquidation was "only such as a reasonably prudent man would undertake in the preservation of the property or the minimizing of his loss, and is consistent with the primary purpose of liquidation * * *." Nee v. Linwood Securities Co., supra; and Myers v. Com-

missioner, 7 Cir., 89 F.2d 86, are to the same effect.

In Frederick Pitzman et al., Trustees, 36 B.T.A. 81, 92, 93, acq. 1937–2 C.B. 22, it was held that conservation of resources pending disposition is quite different from conducting a business for profit, and that the law does not require trustees to sacrifice property in order to speed up liquidation. Helvering v. Washburn, 8 Cir., 99 F.2d 478, stands for the proposition that a trust, formed for the purpose of liquidation as soon as circumstances permit and carrying on business only as incident necessary for preservation of trust property, is not an association taxable as a corporation.

Another test applied by the courts and the regulations in determining whether or not a trust constitutes an association taxable as a corporation is the degree of resemblance the trust arrangement bears to a corporation. If the resemblance is substantial, the trust is deemed to be an association taxable as a corporation.

In Morrissey v. Commissioner, supra, the Supreme Court laid down five criteria to be used in determining whether an organization substantially resembles a corporation.

They are: (1) Ownership of property as an entity; (2) Continuity of existence; (3) Transferability of beneficial interest; (4) Centralized management; and (5) Limitation of personal liability.

The criteria set out in the regulations [6] are essentially the same.

Applying these criteria to the instant case we see that the property was con-

---

because it is formed with the objective of liquidating particular assets and not as an organization having as its purpose the carrying on of a profit-making business which normally would be conducted through business organizations classified as corporations or partnerships. However, if the liquidation is unreasonably prolonged or if the liquidation purpose becomes so obscured by business activities that the declared purpose of liquidation can be said to be lost or abandoned, the status of the organization will no longer be that of a liquidating trust. Bondhold-

ers' protective committees, voting trusts, and other agencies formed to protect the interests of security holders during insolvency, bankruptcy, or corporate reorganization proceedings are analogous to liquidating trusts but if subsequently utilized to further the control or profitable operation of a going business on a permanent continuing basis, they will lose their classification as trusts for purposes of the Internal Revenue Code." [24 Fed.Reg. 10454–10455.]

**6.** Footnote 3, supra.

veyed to the trustees individually, and was not owned by the committee as an entity. We also see that there was centralized management and transferability of beneficial interest. There was no limitation of personal liability.

The defendant contends that although the trust was initially formed for five years, since it could be, and in fact was, extended, .continuity of existence was present. We cannot agree. This is not the type of continuity of existence that is generally ascribed to a corporation.

It is true that this trust possessed some characteristics of a business organization, but there was no substantial resemblance to a corporation. Three of the five criteria set out by the Supreme Court in Morrissey were not met. The two that were present, transferability of beneficial interest, and centralized management are also common to partnerships. As was said in Myers v. Commissioner, supra, at page 89:

"* * * Every trust of the purest type necessarily has attributes of a business organization. Its very existence depends on such. That characteristic alone cannot brand it as an 'association'."

Plaintiffs were liquidating trustees, not engaged in the real estate business for profit, and their organization did not bear a substantial resemblance to a corporation. Consequently, they did not constitute an association taxable as a corporation.

Because plaintiffs, during the tax years involved, did not constitute an association taxable as a corporation, and since the gains realized by them from the sales of real property were correctly reported as capital gains, the fiduciary income tax returns filed by the plaintiffs for the years 1946 through 1950 were properly filed, and plaintiffs are entitled to recover, with interest as provided by law, and judgment will be entered to that effect.

The amount of recovery will be determined pursuant to Rule 38(c) of the Rules of this court, 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and REED, Justice (Retired), sitting by designation, LITTLETON, Judge (Retired) and MADDEN, Judge, concur.

WHITAKER, Judge, took no part in the consideration and decision of this case.