Joan E. Heller Trust (Formerly Joan E. Smotkin Trust), Arizona Trust Co., Trustee, et al. [1] v. Commissioner. Heller Trust v. Commissioner
Docket Nos. 87419-87423.
United States Tax Court
T.C. Memo 1965-302; 1965 Tax Ct. Memo LEXIS 28; 24 T.C.M. (CCH) 1663; T.C.M. (RIA) 65302; November 18, 1965
David W. Richter, for the petitioners. David R. Brennan, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined the following income tax deficiencies: Docket
Income Tax
No.
Petitioner
Year
Deficiency
87419
Joan E. Heller Trust (Formerly Joan E. Smotkin
Trust), Arizona Trust Co., Trustee
1955
$ 567.66
1956
10,231.42
87420
Carole D. Smotkin Trust, Arizona Trust Co., Trustee
1955
567.66
1956
10,231.42
1957
2,657.92
87421
Robert M. Heller and Joan E. Heller, husband and wife
1957
1,844.45
87422
Harold J. Smotkin Trust, Arizona Trust Co., Trustee
1955
567.66
1956
10,231.42
1957
2,657.92
87423
Edward E. Smotkin and Betty J. Smotkin, husband
and wife
1955
5,803.40
1956
90,889.43
1957
27,069.74
The issues in these consolidated cases are (1) whether the gains realized from the sale of duplex houses during the years here involved are taxable as ordinary income or capital gains; (2) whether contracts received by petitioners from the purchasers of the duplex houses are includable in income in the year of *30 sale to the extent of their fair market value; and (3) whether petitioners are entitled to deductions for payments made to a controlled corporation as selling agent in connection with the sale of the duplex houses. Findings of Fact Some of the facts were stipulated and they are so found. Edward E. Smotkin and Betty J. Smotkin, husband and wife, are residents of Tucson, Arizona. They filed their joint Federal income tax returns for the years in issue with the district director of internal revenue, Phoenix, Arizona. The Joan E. Heller Trust (formerly Joan E. Smotkin Trust), the Carole D. Smotkin Trust and the Harold J. Smotkin Trust are trusts created under the laws of the State of Arizona. The trustee of all the trusts is the Arizona Trust Company, and its principal place of business is Tucson, Arizona. The income tax returns for each of the trusts for the years here involved were filed with the district director of internal revenue, Phoenix, Arizona. Robert M. Heller and Joan E. Heller, husband and wife, have a mailing address of 55 Camino Espanol, Tucson, Arizona. Their joint Federal income tax return for 1957 was filed with the district director of internal revenue, Phoenix, *31 Arizona. Beginning in 1938, Smotkin entered into a partnership agreement with George Bromley and from 1938 to 1941 the partnership was in the house siding business in Detroit, Michigan, and Columbus, Ohio. In 1941 the partnership, known as American Homes Association, terminated its house siding business and engaged in the business of developing, building and selling real estate in the area of Columbus, Ohio. In the latter part of 1941 Bromley left the partnership and, thereafter, Smotkin operated the same business as an individual under the name American Homes Association until the business was terminated in 1944. In 1944, for reasons of his wife's health, Smotkin retired and moved to Beverly Hills, California. Thereafter he entered the photo-finishing business, which business was terminated in 1948 when he moved to Tucson, Arizona. In 1948 Smotkin formed a partnership with Bromley and with Jay Smotkin (petitioner's brother) under the name of American Homes Association, hereinafter called the partnership. After Jay was bought out in 1949, Smotkin had a two-thirds interest and Bromley a one-third interest in the capital, profits and losses of the partnership. In February 1948 *32 the partnership purchased an 80-acre tract of land near Tucson, Arizona, and by the latter part of 1949 or early 1950 the partnership had purchased two adjacent 80-acre tracts of land. During the period from 1948 to June 30, 1951 the partnership built and sold approximately 500 dwelling houses on two of the 80-acre tracts. During the period from July to November 1951, Smotkin and Bromley incorporated American Homes Association, American Building Company and six rental corporations (American Rentals, National Rentals, Federal Rentals, Joan Rentals, Harold Rentals and Carole Rentals). Smotkin held a two-thirds interest and Bromley a one-third interest in both American Homes Association, hereinafter called American Homes, and American Building Company. In the last half of 1951 the National Realty Company, which held legal title to the third 80-acre tract for the benefit of Smotkin and Bromley, conveyed such legal title to the six rental corporations whose stock was issued one-third to Smotkin, one-third to Bromley, and one-third to Bromley as Trustee for Smotkin's children. In April 1952 the Arizona Trust Company became successor Trustee in the Trust created by Smotkin and his wife *33 for their children. During the years 1951 and 1952, 194 duplexes (388 dwelling units) were built on the third 80-acre tract by American Building Company for the six rental corporations. American Building Company was liquidated in January 1953. Prior to completion of the duplexes in July 1952, the six rental corporations applied for mortgage insurance from the Federal Housing Administration. In response to the question on the application form "Do you intend to occupy, rent, or sell this property?" the applicants answered "Rent", and in response to the second part of the same question, which asked for the "[proposed] sale price (if for sale)", the applicants gave such sale price as $15,750 for each duplex. Construction financing for the 194 duplexes was obtained through banks and private individuals, and the loans were secured by the duplex lots, by other real estate owned by Smotkin and Bromley and by the personal guarantees of Smotkin and Bromley. Permanent financing was obtained from bank and trust companies, an insurance company and a savings and loan association, and on some of these loans the personal guarantees of Smotkin and Bromley were required. The construction price *34 charged by American Building Company to the rental corporations was $12,600 per duplex, which included coolers, venetian blinds, stoves and refrigerators. The $12,600 figure was also the sum of the permanent financing on each duplex. The land was reflected on the books of the rental corporations at $200 per duplex lot, making a total cost figure of $12,800 for each duplex. On January 2, 1952 a management agreement was executed by American Homes and the six rental corporations under which American Homes agreed to manage the 194 duplexes owned by the rental companies, to act as rental and operating agent and collect rentals, to advertise the properties for rental, and to maintain and repair the properties. It was agreed that American Homes would receive a commission of 10 percent of gross rentals during 1952 and 20 percent of gross rentals after January 1, 1953, and would pay all expenses in connection with the advertising, leasing, maintenance and repair of the properties. During 1953 the occupancy rate of the duplexes was about 65 percent, while during the years 1954 and 1955 the occupancy rate was about 72 percent. The financial statements of the rental corporations during the *35 period 1953 through 1955 show consistent losses. During the first three and one-half months the duplexes were rented, they were rented by written lease agreements. Thereafter, they were rented on an oral month-to-month basis. In order to increase the tenant occupancy of the duplexes, Smotkin proposed early in 1954 that a swimming pool be constructed and that 120 of the units be furnished. Bromley was unwilling to make these changes, which would cost approximately $120,000, and on February 24, 1954 Smotkin and Bromley agreed to a division and distribution of their various property interests. Subsequently, the ownership in the six rental corporations and in American Homes was as follows: Edward E. Smotkin, one-third; Betty J. Smotkin, one-third; and the Arizona Trust Company as Trustee for the three Smotkin children, one-third. In 1954 American Homes constructed the swimming pool and purchased furniture for some of the rental units. During 1955 Smotkin obtained medical care and advice on numerous occasions for various ailments, including paroxysmal auricular tachycardia and a peptic ulcer of the duodenal. Smotkin also suffered from general tension. Early in 1955 Smotkin was also *36 treated by a cardiovascular specialist in San Francisco, California. Smotkin was hospitalized in Tucson in the fall of 1955 for treatment of his peptic ulcer. Smotkin had previously been treated by the cardiovascular specialist in San Francisco in 1952 and 1953. On September 1, 1955 the six rental corporations were liquidated and 186 duplexes were distributed to the stockholders in liquidation. The remaining eight duplexes had been sold between June 1 and August 31, 1955. American Homes served as selling agent for the stockholders and proceeded as rapidly as possible to sell the duplexes. Smotkin was president of American Homes during the years here in issue. Commencing on or about November 1, 1955 the duplexes were advertised for sale. Prior to that the duplexes were advertised only for rent. American Homes employed extensive newspaper and radio advertising as part of its selling efforts. About September 1955 American Homes moved its office to one of the duplexes, opened a model duplex for display, employed a staff of salesmen to handle the sales, and prepared and distributed sales brochures to customers. At the time of the sale of each duplex it was completely reconditioned and *37 redecorated inside and out by American Homes. In addition, American Homes paid for the closing costs incurred in selling the duplexes. American Homes also offered the free use of the pool for a temporary period to a purchaser of a duplex and his tenant. The books and records of American Homes show that owners and tenants of the duplexes were not charged for pool service until May 1, 1958. A typical pool agreement stated that after a cut-off date the pool privilege would be optional to the owner and his tenants at a specified annual price. After the sale of duplexes and during the years in issue, American Homes acted as rental agent for some of the new owners. There was no charge for the rental service, but if American Homes collected the rents for the owners and disbursed the same, a charge of $5 per month was made. The free rental service was to be provided for a five-year period. In addition, American Homes provided free garbage collection service for a limited period of time to owners of duplexs and their tenants. During the period 1955 to 1958, 169 duplexes were sold. The remaining 17 duplexes were exchanged in 1956 for a cattle ranch. Approximately 55 of the duplexes were *38 sold furnished. Most of the duplexes were sold at prices ranging from about $15,000 to about $16,200. A typical sale would be handled in the following manner: FHA mortgage assumed by
purchaser
$11,419.98
Cash down payment
1,100.00
Contract
2,710.02
Total sales price
$15,230.00 The contract ($2,710.02 in the above example) executed by the purchaser provided for interest of 6 percent per annum and required payments of principal and interest totaling $25 per month, with the entire contract sum due in five years. If the sale involved a furnished duplex, then the contract would require a payment of principal and interest totaling $45 per month. Petitioners generally paid American Homes $1,500 for each duplex sold through the period up to November 1956 and they paid $2,000 each for most of the duplexes sold after that date. During the years 1956 through 1962 petitioners also reported on their returns the following sales: Gross
Year
Asset Sold
Date Acquired
Sales Price
Gain
1956
Land
1946 and 1951
$75,000.00
$67,967.19
1957
Land
Not shown
71,000.00
62,745.00
1958
Land
1948 and 1951
$10,000.00
$ 8,422.65
Land
1955
4,021.42
2,258.58
Land
8,571.43
4,898.34
1959
1/3 interest in ranch
1956 (acquired in exchange for
duplexes)
58,942.58
35,263.60
Land
Not shown
10,000.00
8,790.00
1960
Ranch
1956 (acquired in exchange for
duplexes)
9,000.00
5,293.50
1961
Land
1959
28,000.00
25,691.14
1962
Car wash and land
1961
74,900.00
21,663.09
Land and Building
1956
44,008.94
40,957.27
*39 In 1956 Smotkin obtained a real estate broker's license as a designated broker for American Homes. Such license has been renewed annually to the present time. Smotkin is a member of the National Board of Realtors and the Tucson Real Estate Board. The Smotkin interests retained portions of each of three 80-acre tracts for commercial development. Subsequent to the sale of the duplexes, the commercial property was developed, with American Homes acting as contractor in building stores. The name of American Homes has now been changed to Greater Broadway Development Company. Smotkin has recently been active in seeking a rezoning of certain land in the Tucson area to permit high rise structures. On their respective Federal income tax returns for the years 1955, 1956 and 1957 the petitioners claimed deductions as selling expenses for the $1,500 or $2,000 payments made by them to American Homes for each of the duplexes sold during that period. Respondent determined that these "real estate selling commissions in excess of the prevailing 5 percent rate are not allowable since the excess constitutes an improper allocation of income to a wholly-owned corporation." Petitioners, on their *40 respective Federal income tax returns for the years here involved, reported the gains realized from the sale of the duplexes during that period as long-term capital gains. In addition, the petitioners (as cash basis taxpayers) considered the contracts received by them from the purchasers of the duplexes as having no ascertainable fair market value and, accordingly, reported the payments on the contracts as income only in the year in which the payments exceeded their adjusted basis. Respondent determined (1) that the gains realized from the sales of duplexes constituted ordinary income from business operations rather than capital gains from the sale of capital assets, and (2) that the "purchase contracts received in the sales of duplexes had a value of 50 percent of the amounts payable thereunder for purposes of computing profits resulting from the sales of duplexes." Opinion The first issue is whether the gains realized by petitioners from the sale of the duplexes in the years 1955, 1956 and 1957 are taxable as long-term capital gains or as ordinary income. The question turns upon whether the duplexes are "property held by the taxpayer primarily for sale to customers in the ordinary *41 course of his trade or business". Sections 1221 and 1231 of the Internal Revenue Code of 1954. The question is one of fact. The numerous cases in this area have evolved a series of tests, i.e., the purpose of acquisition, frequency of sales, activity of the taxpayer, the nature and extent of his business, and the purpose for which the property was held during the period in question, but no single test is decisive. [2]
We are persuaded, on this record, that the sale of the duplexes during the years in issue did not represent the liquidation of an investment, as contended by petitioners, but instead were sales of property in the ordinary course of business. With some interruptions, Smotkin had been active in building, developing and selling real estate since about 1941, first in Columbus, Ohio, and later (1948) in Tucson, Arizona. Just prior to the construction of the 194 duplexes here involved, Smotkin *42 and Bromley built and sold about 500 houses on two adjacent tracts of land. When the 194 duplexes were constructed in 1951 and 1952 they were used to meet the shortage of rental housing then existing in the Tucson area caused by an influx of workers. But we are not persuaded that petitioners were embarking on an investment program based upon the rental of the duplexes. It is clear from this record that they also contemplated the profitable sale of these duplexes if it turned out to be the more desirable course of action. In the applications to the FHA during the construction of the duplexes they mentioned, as an alternative to rental, a proposed sale price of $15,750 for each duplex, which figure coincides remarkably with the price range of the duplexes when they were actually sold. In 1953, a little more than a year after the completion of the duplexes, Smotkin employed an appraiser to determine sales prices for the duplexes. Except for a brief initial period, the duplexes were rented on an oral month-to-month basis. Smotkin's own testimony disputes his argument that the sole purpose in constructing the duplexes was to hold them as an investment and that this was abandoned in *43 1955 only after it became unfeasible at that time because of changed economic conditions. The record shows that the duplexes were completed in July 1952. Smotkin testified concerning the need for rental housing in Tucson that "[from] the latter part of 1951 to the middle of 1952 the total situation in Tucson changed completely." In other words, the purported deterioration in the rental housing situation did not come as a surprise in 1955. Moreover, there is evidence in the record about the general employment situation in the Tucson area during the years 1951 to 1955 which appears to refute the contention that the decision to sell the duplexes in 1955 was based upon economic conditions which were not apparent in 1952. Nor are we persuaded that the sale of the duplexes starting in 1955 was triggered by Smotkin's health problems, which the record shows existed as early as 1952 and 1953. Starting late in 1955, the duplexes were advertised for sale, and American Homes (acting as selling agent) employed extensive newspaper and radio advertising. A model duplex was opened for display purposes. Sales brochures were distributed to customers. Each duplex was completely reconditioned and *44 redecorated both inside and out. In 1956 Smotkin obtained a real estate broker's license as a designated broker for American Homes. During the period 1955 to 1958, 169 duplexes were sold, most of them at prices ranging from about $15,000 to $16,200, and the remaining 17 duplexes were exchanged for a cattle ranch. Finally, the record shows that Smotkin and American Homes (with Smotkin as president) have continued in various real estate activities in subsequent years. We believe this record amply shows that, from the very outset, petitioners were prepared to either rent or sell these 194 duplexes, whichever proved the most profitable course of action, and when the selling campaign began in 1955, it was vigorously pursued with all available means. We recognize that a distinction must be observed between the sale of an asset which has been held as an investment and the sale of assets to customers in the ordinary course of the taxpayer's business. An apt statement of this distinction appears in Malat v. Riddell, 347 F. 2d 23, certiorari granted - U.S. - (1965), where the Court, in rejecting the taxpayer's contention that he was liquidating rental property held as an investment, *45 stated the following: (1) If the purpose for which the property was acquired and held was solely and specifically to develop for rental; if it excluded the realization of gain other than in that fashion; and if such purpose was accompanied by an intent to liquidate (irrespective of consequent gain or loss) if this purpose failed, then a sale pursuant to such a program might well be regarded as nothing more than liquidation of a disappointing investment. (2) If, however, the property was acquired and held with the purpose of realizing gain from it in any feasible manner which might present itself; if the owner stood ready to adopt his program to such changes as failing prospects might require and to realize gain wherever and however he could; then surely the realization of gain by sale is pursuant to the purpose of the holding. The taxpayer in such a case could be said throughout the course of his holding to have had several alternative purposes * * *, each of which in turn actually became the primary purpose as efforts were concentrated in its direction. We find, and so hold, that the duplexes sold by petitioners during the years here in issue were held by them for sale to customers *46 in the ordinary course of their trade or business, and that the gains realized by petitioners during the years in issue are taxable as ordinary income. The next issue is whether the contracts received by petitioners during the years in issue from the purchasers of the duplexes in partial payment are includable in petitioners' taxable income in the year of sale, as determined by respondent, to the extent of 50 percent of their face value. It is petitioners' contention that these contracts had no ascertainable fair market value when received and that, as cash basis taxpayers, they were not obliged to include such contracts in taxable income to any extent in the year of sale. Section 1001(a) of the Internal Revenue Code of 1954 provides that "[the] gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain", and section 1001(b) of the Internal Revenue Code of 1954 defines the amount realized as "the sum of any money received plus the fair market value of the property (other than money) received." The question is not, *47 as petitioners seem to argue, whether the contracts are negotiable instruments but whether, under the facts on record, we can determine a fair market value for these contracts at the time they were received from purchasers of the duplexes. The only evidence as to fair market value of these contracts comes from the petitioners' own witness, and it appears to support respondent's determination that such contracts had a fair market value when received of 50 percent of their face value. The witness, a professional appraiser of real property and a real estate consultant in the Tucson area, testified that "I would be interested in buying it [a contract] only at a discount, not for face value". He further testified that such discount "would range anywhere from 40 percent to 65 or 70 percent" depending upon such factors as whether the purchaser had paid a fair price for the duplex, his equity in the property, and whether the purchaser showed financial responsibility. The record shows that such factors would be favorable, since the duplexes had all been completely reconditioned, the sales prices were not much in excess of a sales price suggested by an appraiser in 1953, the purchasers generally *48 made cash down payments of at least 10 percent of the purchase price and in many cases even higher down payments, a purchaser could rent one-half of his duplex to a tenant, and finally, there is no indication that the payments on these contracts (which had to be paid in full within a five-year period) were not generally made as required. Petitioners make some argument that these contracts would not move freely in commerce because there were certain attached obligations, as the upkeep of the swimming pool, free rental service and free garbage service. It appears, however, that these were obligations of American Homes, a separate corporation, and not petitioners' obligations, and that such obligations were incurred for limited periods only. We cannot agree with petitioners that these obligations would deprive the contracts of any ascertainable fair market value when received. At most, they may be considered only in testing the reasonableness of a discount to be applied to the face value of such contracts in arriving at a fair market value for income tax purposes. On the basis of the entire record, we find, and so hold, that the contracts had a fair market value when received equal *49 to 50 percent of their face value and that they are includable in petitioners' taxable income at that fair market value in the year of sale. The last issue involves the correctness of respondent's disallowance of all amounts paid by petitioners as selling commissions to American Homes in excess of 5 percent, which respondent describes as the standard real estate sales commission rate in the Tucson area. In most instances the $1,500 payments were made to American Homes in connection with duplexes sold for about $15,200, while the $2,000 payments were generally made in connection with duplexes that were sold for more than $16,000. It is petitioners' argument that they should not be limited to the standard 5 percent rate because, in addition to the normal activities of a sales agent, American Homes completely reconditioned and redecorated the duplexes, paid for an extensive advertising campaign in newspapers and on the radio, and paid for closing costs and other incidental expenses in connection with the sales of the duplexes. The only evidence we have is the testimony of petitioners' witness (referred to above) who testified that the sales commission rate in 1955 and 1956 and for *50 part of 1957 had been 5 percent of the sales price (increasing to 6 percent in April 1957), but "[when] a broker promises to perform certain services which are more than usual in the sale of a piece of property, such as promising to do advertising or pay any costs which ordinarily a property owner himself pays them, in this instance a broker would pay them, the commission rate is generally increased." The witness also testified that redecorating costs borne by the broker would also increase the commissions. Respondent places his reliance upon section 482 of the Internal Revenue Code of 1954[3] in limiting the sales commissions to 5 percent. We can perceive no justification under the facts of this case for respondent's efforts to reallocate income and expenditures among petitioners and their controlled corporation, American Homes. On brief, respondent's argument seems to be related to a purported history of "milking" of various affiliated corporations by petitioners and others. These allegations are extremely vague and, whether or not true, we need not decide. We cannot decide the issue before us involving the years 1955, 1956 and 1957 on the basis of innuendos *51 as to conduct in the past involving completely different and unrelated real estate operations. The testimony of petitioners' witness remains undisputed and we see no reason to doubt it. Respondent complains that petitioners made no attempt to allocate to each duplex sold the appropriate amount of reconditioning and repair expenditures, advertising expenditures, and other costs which were incurred by American Homes in its selling campaign. Such precise accounting, however, would be impractical under *52 the facts of this case, since it would entail exhaustive record-keeping on the varying amounts of work done to 194 duplexes (388 housing units), some of which were furnished. We believe that the practical approach taken by petitioners of absorbing these costs plus the regular sales commission in the fixed sum of $1,500 to most of the duplexes selling for about $15,200 and the sum of $2,000 to most of the duplexes selling for higher amounts, is a reasonable one under the circumstances of this case. We believe that petitioners have met their burden of showing that these selling expenses were ordinary and necessary business expenses incurred in the sale of the duplexes, and we hold that they were properly deductible by petitioners during the years in issue. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: CAROLE D. SMOTKIN TRUST, ARIZONA TRUST CO., TRUSTEE, Docket No. 87420; ROBERT M. HELLER and JOAN E. HELLER, husband and wife, Docket No. 87421; HAROLD J. SMOTKIN TRUST, ARIZONA TRUST CO., TRUSTEE, Docket No. 87422; and EDWARD E. SMOTKIN and BETTY J. SMOTKIN, husband and wife, Docket No. 87423.↩
2. It will only be necessary to focus upon the activities of Smotkin since it is clear from the record that he was the dominant figure in the real estate ventures and that any finding with respect to him will be equally applicable to the other petitioners.↩
3. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩