**William MALAT and Ethel Malat, Appellants,**

v.

**Robert A. RIDDELL, District Director of Internal Revenue, Appellee.**

**No. 19286.**

United States Court of Appeals
Ninth Circuit.

May 27, 1965.

**24**

George T. Altman, Beverly Hills, Cal., for appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., Thomas R. Sheridan, U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief, Tax Sec., James S. Bay, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before MERRILL, DUNIWAY and ELY, Circuit Judges.

MERRILL, Circuit Judge.

Profit derived from sales of property held by a taxpayer, primarily for sale to customers in the ordinary course of his trade or business, is, under section 1221 of the Internal Revenue Code of 1954,[1] excluded from treatment as capital gain. This case presents the question whether real estate sold at a profit by one engaged in the business of dealing in real estate had, under the particular circumstances, been held by him as an investment or primarily for sale to customers. Upon this issue the trial court has found against the taxpayer, ruling that the profit must accordingly be treated as ordinary income. We conclude that the District Court's finding is not clearly erroneous and affirm.

The case involves income tax for the year 1956. The taxpayer[2] had reported the gain on the transaction in question as capital gain. The Internal Revenue Service disagreed. A deficiency was assessed and was paid by the taxpayer. This suit for recovery followed.

Taxpayer at all times pertinent to this case was a member of Louis Lesser Enterprises, Ltd., a partnership (to which we shall refer as "Lesser"), which for some time as a business enterprise had been engaged in the purchase and development of real estate for rental.

In 1953 Lesser and four individuals not members of the partnership negotiated for the purchase of 44.901 acres of agricultural land, located at Century and Crenshaw boulevards in Inglewood, California. On August 12, 1953, they organized Century-Crenshaw Plaza as a joint venture, entered into agreement for purchase of the property for the sum of $486,000 and established an escrow for that purpose. At the time of the establishment of the escrow the land was zoned agricultural. A condition to the closing of the escrow was that it be rezoned as residential, and that a corner parcel retained by the seller, 600 x 600 feet, be rezoned as commercial. These changes in zoning were accomplished and the escrow was closed on February 15, 1954.

---

1. Section 1221, Internal Revenue Code of 1954, reads:
   "Sec. 1221. Capital asset defined.
   For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * ."

2. William Malat is referred to as the taxpayer. His wife is joined since a joint return was filed.

In the meantime the intentions of the venturers with respect to the land had undergone a series of changes.

At the outset, as taxpayer testified, they "had in mind" a garden-type apartment development of the entire property —a single-mortgage development, requiring no division of the property into separate parcels. This was contingent not only on their securing zoning changes (in which they were successful) but (since they were themselves in no position to finance the project) also on their ability to secure adequate financing. In this respect they first sought the assistance of the Federal Housing Administration but found that they could not secure FHA guarantees on terms acceptable to them. They next sought conventional financing. Their efforts, through mortgage brokers and savings and loan associations, failed. As taxpayer testified, "The mortgage market was very, very soft then, very tight." They then abandoned their original idea of a single-mortgage project. Taxpayer testified: "Our next thought was to build individual apartments, 4-, 6-, 8-unit buildings and finance each one with a separate mortgage." This involved carving out an inner parcel of 20 to 25 acres for the apartment buildings and retaining the two frontage areas on Century and Crenshaw boulevards for commercial use. A subdivision map covering the inner parcel was presented to the City of Inglewood and approved. For two reasons, this idea also had to be abandoned. The rezoning of the frontages could not be secured. Also, despite all efforts, the venturers were still unable to secure financing.

They were now faced with interest charges on their trust deed and with the cost of street improvements and like subdivision expenses. Taxpayer testified "So we took the next best route, * * * and proceeded to sell the lots, the individual lots in the subdivision." The frontage parcels were retained, still in hope that commercial zoning could be secured as to them. The prospects of rezoning remained discouraging and a rift developed among the venturers:

Lesser and two individuals "wanted to get out and be done with it." The other two wished to hold on. Eventually those who wished to get out, including Lesser, sold out their interests.

The gain which the venturers had realized on sale of the subdivision lots had been reported as ordinary income and is not here involved. Our sole concern is with the gain realized on the sale of the two frontage parcels.

Taxpayer contends that at no time had the venturers ever contemplated sale of these parcels until the rift among them brought about a change of plans; that at all times these parcels had been held for future development for the production of income; that when the subdivided lots had been sold the frontages were withheld from sale pursuant to original intent.

The Government contends that the prospect of sale was present from the outset, and constituted a primary purpose of the holding at the time of the sale. It points to the following testimony of taxpayer:

"Q: Mr. Malat, at the time that you were considering the zoning potential and the development potential of this property, did you contemplate, in acquiring the property, the possibility that rezoning or refinancing, or whatever, might not be possible?

A: This is always a possibility in real estate development.

Q: And what was your intention if that couldn't—I mean, you must have considered this as well.

A: Well, this was a bridge that we all felt we would cross when we came to it. We would first do the things—we felt that we had made a good buy on the property as far as price is concerned, so that if we couldn't do anything in the way of zoning, we would sell the whole thing off in bulk. We wouldn't get hurt. So, there was no urgency. There was no need to say, 'Well, if this doesn't happen, and that doesn't

happen—' we took one step at a time."

The District Court, in its memorandum opinion, stated:

"It appears from the testimony of plaintiff read into evidence from his deposition, referred to above, that the property here in question was purchased with the thought in mind that if the rezoning or appropriate financing could not be accomplished that the parties 'would sell the whole thing off in bulk. We wouldn't get hurt.' "

And further:

"The rift between the partners may have expedited the sale but it appears that the failure to obtain rezoning and satisfactory financing was the primary cause of the sale which was the step intended by the parties to be taken at the time the property was acquired and while it was held, if the rezoning and financing failed. In other words, the property was purchased and held for development *or sale* depending on which course appeared to be most profitable, having in mind the need for rezoning and the availability of proper financing on reasonable terms."

The court concluded that at the time of sale of the frontages the properties were held with a dual purpose; that sale of the properties was an essential purpose. Relying on Rollingwood Corporation v. Commissioner of Internal Revenue, 190 F.2d 263 (9th Cir. 1951), it held taxpayer not entitled to capital-gain treatment.

Taxpayer seeks to distinguish Rollingwood on the ground that there the dual purpose was clearly fixed in a lease-or-option arrangement to which taxpayer was committed. Here, he asserts, the only "dual purpose" lies in his recognition, wholly consistent with investment, that sale might ultimately be felt to be more desirable financially than a continued holding for investment. Cf., Municipal Bond Corp. v. Commissioner of

Internal Revenue, 341 F.2d 683 (8th Cir. 1965).

We quite agree with taxpayer that an investor's prospective recognition of the fact that he may ultimately wish to realize on his investment is not enough to constitute sale a dual purpose of the holding. Rollingwood does not require such a result. We cannot agree with taxpayer, however, that this is such a case.

In such a case as this the purpose of the holding is undoubtedly difficult of ascertainment. Where an investment program has been followed through, it is there for all to see. Where it has been frustrated at the outset and resort is had to sale, the purpose of the holding at the time of sale is far more questionable. Was the sale a liquidation of an investment whose prospects had proved disappointing? To put the question another way, was it the exercise of a purpose *not* to hold rather than of a purpose to hold for sale?

In our judgment the answer in such a case must be found in the scope of the gain-producing purpose for which the property was acquired and held. Two situations may be hypothesized to illustrate what we mean.

(1) If the purpose for which the property was acquired and held was solely and specifically to develop for rental; if it excluded the realization of gain other than in that fashion; and if such purpose was accompanied by an intent to liquidate (irrespective of consequent gain or loss) if this purpose failed, then a sale pursuant to such a program might well be regarded as nothing more than liquidation of a disappointing investment.

(2) If, however, the property was acquired and held with the purpose of realizing gain from it in any feasible manner which might present itself; if the owner stood ready to adapt his program to such changes as failing prospects might require and to realize gain wherever and however he could; then surely the realization of gain by sale is pursuant to the purpose of the holding. The taxpayer in such a case could be said throughout

in course of his holding to have had several alternative purposes (all of which were substantial reasons for his holding within the Rollingwood definition of "primary"), each of which in turn actually became the primary purpose as efforts were concentrated in its direction.

The nature and extent of the gain-producing purpose is, of course, a factual issue. Whether in a particular case it falls on the investment-limited side of the line or on the all-encompassing side is a question of fact.

The District Court in substance has found that the scope of the taxpayer's intent was all-encompassing.[3] In our judgment the record amply supports that finding.

In this connection we note first that it must be recognized that in the case of one who deals generally in real estate the rational inference is that the purpose of the holding was all-encompassing. The dealer is, after all, in the business of acting in precisely that fashion. Where an avowed purpose to invest (rather than hold for sale) has failed to materialize, the real estate dealer thus has a burden to meet in overcoming the inference that upon failure of the investment prospect the property sold had thereafter been held primarily for sale to customers in the ordinary course of his trade or business. See Margolis v. Commissioner of Internal Revenue, 337 F.2d 1001 (9th Cir. 1964).

While the nature of taxpayer's business was primarily that of development of real estate for rental, and he might therefore dispute the rationality of such an inference in his case,[4] still, the history of his holding provides ample support for the court's finding. That history demonstrates the many possibilities of gain possessed by the property (including subdivision and sale) which were in turn explored by the owners. At the outset taxpayer realized that the original plan might not work out. He would, he testified, cross that bridge when he came to it—take one step at a time.

Certainly it may be said (as the District Court in effect has said) that the purpose of the acquisition encompassed all of the steps which were successively taken, and that the primary purpose of the holding touched on each in turn. Sale, then, was not the liquidation of an investment. It was the final alternative in taxpayer's continuing efforts to realize gain from his acquisition. It was *part* of his plan rather than the abandonment of it.

Under these circumstances, when taxpayer resolved to sell, that purpose (which from the time of acquisition had been one of many alternative essential purposes) became the primary purpose and the property was primarily held for the purpose of sale.

Judgment affirmed.

---

3. The District Court has found as fact that "The members of Plaza, as of the date the 44.901 acres were acquired, intended either to sell the property or develop it for rental, depending upon which course appeared to be the most profitable."

4. It does not appear that the nature of the business of the joint venture, or of the venturers with whom taxpayer was there associated, was so limited. The inference may thus still retain its rationality as to this particular venture of the taxpayer.