Desilu Productions, Inc. v. Commissioner.
Desilu Productions, Inc. v. Commissioner
Docket No. 5114-63.
United States Tax Court
T.C. Memo 1965-307; 1965 Tax Ct. Memo LEXIS 23; 24 T.C.M. (CCH) 1695; T.C.M. (RIA) 65307; November 29, 1965
*23 The sale of certain television films held, not to be a sale of property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business. Held further, depreciation deduction with respect to television films in the year of their sale allowed. Macabe Co., 42 T.C. 1105 (1964) followed. *24 Arthur Manella and Ronald L. Blanc, 9171 Wilshire Blvd., Beverly Hills, Calif., for the petitioner. Paul G. Wilson, for the respondent. DAWSON
DAWSON, Judge: Respondent determined a deficiency in petitioner's income tax for the taxable year ended April 28, 1962, in the amount of $122,630.31. This deficiency arose mainly from respondent's determination that the gain from the sale of certain television films should be treated as ordinary income rather than capital gain and the disallowance of a depreciation deduction taken in the year the films were sold. Several issues have been settled by stipulation of the parties, conceded or abandoned, thus leaving two issues for our decision. They are: 1. Whether the 13 filmed television shows sold on March 6, 1962, by Desilu Productions, Inc., to CBS Television Network, a division of Columbia Broadcasting System, Inc., were held by petitioner primarily for sale in the ordinary course of its business. 2. Whether Desilu Productions, Inc., is entitled to a deduction for depreciation of the 13 filmed television shows in the year of their sale where the amount realized by petitioner from the sale exceeded the adjusted basis of *25 the shows at the beginning of the year of sale. Memorandum Findings of Fact and Opinion The pertinent facts stipulated by the parties are hereby found accordingly. Desilu Productions, Inc. (hereinafter sometimes referred to as petitioner) is a California corporation having its principal office in Hollywood, California. Petitioner filed its Federal income tax return for its fiscal year ended April 28, 1962, with the district director of internal revenue at Los Angeles, California. From April 26, 1950, to April 30, 1958, petitioner maintained its books and filed its Federal income tax returns on the cash method of accounting. Since April 30, 1958, petitioner has maintained its books and filed its Federal income tax returns on the accrual method of accounting. Petitioner was organized in 1950, at which time 25 shares of its common stock were issued to Desi Arnaz (hereinafter sometimes referred to as Desi) and 25 shares were issued to his wife, Lucille Ball Arnaz (hereinafter sometimes referred to as Lucy), for an aggregate investment by them of $5,000. These 50 shares constituted the entire outstanding common stock of petitioner and Lucy and Desi continued as sole shareholders *26 until 1954. In April 1954, Columbia Broadcasting System, Inc. (hereinafter sometimes referred to as CBS), paid petitioner $1,000,000 for which it received 24 percent of petitioner's common stock. This stock was subsequently repurchased by petitioner for $1,000,000 in connection with the sale on October 1, 1956, to CBS of petitioner's interest in the "I Love Lucy" and "December Bride" film series, which petitioner had produced between August 1951 and the end of the 1955-56 television season. In connection with such sale, petitioner, on November 16, 1956, applied to respondent for a ruling that capital gain treatment, under the provisions of section 1231 of the Internal Revenue Code of 1954, [1] might be accorded to the gain realized by petitioner upon the sale of its interest in the two series. On February 11, 1957, respondent issued a letter ruling, based on petitioner's representations, to the effect that the two filmed series constituted property used in petitioner's trade or business within the meaning of section 1231(b) and that accordingly the gain or loss to be realized by petitioner upon the sale of the property would be capital gain or loss. *27 In May 1958, Lucy and Desi sold a portion of their common stock to certain key employees. In December 1958, in order to obtain additional working capital, petitioner recapitalized and sold 250,000 shares of new common stock to the public, at a price of $10 per share. In addition, 275,000 shares were sold to the public at the same price by Lucy and Desi in equal proportions. Immediately thereafter petitioner had outstanding 584,400 shares of common stock, owned by the public and certain key employees, and 565,600 shares of Class B common stock owned equally by Lucy and Desi. In November 1962, Lucy, who on May 16, 1961, was divorced from Desi, acquired all of Desi's stock in petitioner. Desi thereupon resigned as president of petitioner, a position which he had occupied since the company's inception, and retired from the company Since November 1962, Lucy has been president of petitioner. At the present time petitioner has approximately 5,000 shareholders and its stock is listed for trading on the American Stock Exchange. Since 1951, petitioner has been engaged in the business of producing motion picture films for television exhibition for its own account and providing production *28 services and facilities to others. Petitioner derives rental income from the licensing for telecast to networks, sponsors, and individual television stations of television films produced for its own account. It also derives income from fees for furnishing its production facilities and services to other television and theatrical motion picture producers. In producing its own television films, petitioner typically creates a "pilot" (a sample episode) at a high cost. On the basis of the pilot and petitioner's history of producing a series equal in quality to the pilot, petitioner attempts to obtain a network license for the first-run exhibition of the contemplated film series on a fixed rental basis. Such network license is usually made with the network itself or with one or more national sponsors through their advertising agencies, sometimes including "repeats." In addition, the petitioner will license these same films for further telecasting either on a television network again, or on individual television stations in the United States and foreign countries. Such licensing to individual stations is commonly referred to as "syndication." Petitioner's facilities are among the largest *29 in the industry devoted primarily to the production of television shows. Its 60.7 acres of real estate contain 39 stages and 424,359 square feet of shooting area which comprise 24.6 percent of the stages and 24.4 percent of the total area available for television production in Southern California. The studios are completely equipped for motion picture production and the buildings, improvements and production equipment have an estimated replacement cost value of $18,000,000. To carry on its activities of developing new television series to be produced for its own account, petitioner has a permanent programming department, staffed with a vice president and assistants, a business affairs department and a legal department to search out, develop and acquire literary properties and talent for new series. Petitioner also has a complete production facility and extensive technical personnel to fashion all the elements into a pilot and then a television series. During the last four years petitioner has spent approximately a million dollars per year on its development program. Petitioner accounts for the income from licensing television shows for its own account by accumulating the costs *30 of producing the shows and amortizing such costs over the total licensing income expected to be derived. Petitioner accounts for the income from providing its production services and facilities to outside companies by accruing such income as fees at the time the services are rendered and the facilities are supplied. Over the last 10 years petitioner has realized more than $98,000,000 from supplying production services and facilities to outside companies and more than $60,000,000 from licensing and relicensing the 16 series which it has produced and continues to hold for its own account. Many of these 16 series have continuously yielded licensing income from the time of original production. Of the $60,000,000 of licensing income realized over the last 10 years, petitioner has earned approximately $53,000,000 since 1960 as its film library has increased in number. Except for the films sold in 1956 in conjunction with the redemption of CBS's stock and the 13 Lucy-Desi one-hour films (hereinafter sometimes referred to as Jumbos) here in issue, all of the films petitioner has produced for its own account are represented by the 16 series or 605 films which petitioner still owns. By 1961 *31 petitioner had accumulated a library of its own films which it considered sufficient in number to sustain a distribution organization of its own. Petitioner established its own distribution company in the form of a subsidiary, denominated Desilu Sales, Inc., which in turn has subsidiary companies. Desilu Sales, Inc., and its subsidiaries have a world-wide staff of salesmen who arrange for the relicensing of petitioner's product to local television stations here and abroad. Since inception, Desilu Sales, Inc., and its subsidiaries have realized more than $7,500,000 from distributing petitioner's shows. Not only has petitioner committed itself to developing a large number of its own series for distribution through Desilu Sales, Inc., but Desilu Sales, Inc., itself has purchased distribution rights from outside producers and has also advanced sums to other outside producers at the time of production in order to obtain distribution rights to the series. Petitioner's major competitors, Metro-Goldwyn-Mayer, Inc., Screen Gems, Inc., Warner Bros. Pictures, Inc., Four Star Television, and Twentieth-Century-Fox Television, Inc., also produce television films for licensing to networks and local *32 television stations here and abroad. None of these companies has ever made an outright sale of its interest in any of its television films. In 1957, petitioner undertook to produce a series of one-hour filmed television shows (Jumbos), starring Lucy and Desi, to be called "The Lucy-Desi Show." Under an agreement entered into between CBS and petitioner dated June 17, 1957, CBS granted to petitioner the right to use the "I Love Lucy" format, characters and characterizations (which had been transferred to CBS as part of the October 1, 1956, sale of the "I Love Lucy" films and redemption of CBS's stock) for the production by petitioner of up to 18 "Lucy-Desi" Jumbos. Petitioner agreed to pay to CBS 35 percent of the profits realized from these films. In addition, petitioner granted to CBS the exclusive right to distribute the films by renting them on petitioner's behalf after petitioner had itself rented them on a firstrun (and intermixed network repeat) basis. The exercise of such distribution rights by CBS was subject to the prior mutual approval of CBS and petitioner, and, in addition, CBS agreed to consult with petitioner concerning any distribution plan. For its distribution services, *33 CBS was to receive distribution fees ranging from 5 percent of the gross income derived from licensing the programs on a network basis to as much as 35 percent of the gross income derived from licensing the programs on a syndicated basis. The distribution rights granted to CBS were to revert to petitioner in the event CBS terminated its participation in the film syndication business. In such event, however, CBS was still entitled to be paid 35 percent of the net profits realized from distribution of the films. Petitioner entered into agreements with Ford Motor Company in 1957 and Westinghouse Electric Company in 1958, under which petitioner agreed to produce, and the sponsors agreed to rent, the Jumbos for first-run and intermixed repeat exhibition on the CBS network. Pursuant to the agreements, petitioner, during its fiscal years ended May 3, 1958, May 2, 1959, and April 30, 1960, produced 13 "Lucy-Desi" Jumbos. Of these 13 programs, five were produced for first-run network exhibition during the 1957-58 television season (from fall of 1957 to summer of 1958), five during the 1958-59 television season, and three during the 1959-60 television season. Eight of these 13 programs were *34 repeated on the network during the same three seasons. Of the foregoing 21 exhibitions of the 13 films, the last exhibition occurred on June 3, 1960. For the network exhibition of its Jumbos, petitioner received, pursuant to its contracts with Ford Motor Company and Westinghouse Electric Co., the following rental or licensing income: Fiscal year ended
Amount of rental
May 3, 1958
$1,500,000
May 2, 1959
1,955,000
April 30, 1960
1,619,840
April 29, 1961
100,550
Total
$5,175,390 In addition, during its fiscal year ended April 28, 1962, petitioner accrued $65,000 of rental income from the exhibition of the Jumbos in six Australian cities. The total cost to petitioner of producing and telecasting the 13 Jumbos was $4,657,386.48. Petitioner realized total net income of $1,224,933.02 by reason of the telecasting of these Jumbos. The net income reported by petitioner in its Federal income tax returns consisted of the following: (3)
Production costs
Net income
Taxable
(1)
(2)
amortized
(4)
(Sum of col. 1
year
Rental
Production
and rerun
Profit
& 2 less sum
ending
income
income
costs
participations
of col. 3 & 4)
5/03/58
$1,500,000
$210,311.18
$1,209,968.53
$ 500,342.65
5/02/59
1,955,000
176,641.57
1,575,622.89
556,018.68
4/30/60
1,619,840
156,831.52
1,482,840.45
$141,353.77
152,477.30
4/29/61
100,550
53,344.85
38,900.00
8,305.15
4/28/62
65,000
39,796.08
17,414.68
7,789.24
$5,240,390
$543,784.27
$4,361,572.80
$197,668.45
$1,224,933.02
Production costs unamortized at date of sale
295,813.68
Total costs for tax purposes
$4,657,386.48
*35 The production income shown above represents departmental charges by petitioner's own production departments which were charged to the production costs of the shows and were reported as income when such production services were rendered. Following the last network telecast of the films on June 3, 1960, the films became available for relicensing by CBS. CBS did not present any plans to petitioner for the relicensing for the summer of 1960, the next television season, for the regular 1960-61 season, the 1961 summer season, or the regular 1961-62 season. When CBS failed to present any distribution plan whatsoever, Desi became concerned and took the initiative in stimulating CBS to take steps to relicense the films. He had prepared several proposed "packages." Under one proposal the 13 Jumbos were grouped with 20 "Desilu Playhouse" shows. This package called for $125,000 per single showing of each of the Jumbos and $67,500 for a single showing of the other 20 shows. The other package grouped the 13 Jumbos with a series of new one-hour comedy shows. Desi went to CBS headquarters in New York City in the fall of 1960 and presented these proposals to Spencer Harrison (hereinafter sometimes *36 referred to as Harrison), who was then CBS Vice-President in Charge of Business Affairs. The two had a number of meetings in New York during November and December 1960 at which Desi urged that his proposals be implemented or that CBS present a plan of its own for the reuse of the Jumbos. CBS refused to accept Desi's proposals and presented none of its own. As a result of this impasse, Desi and Harrison had several rather acrimonious discussions. At their last meeting, Harrison, in an effort to break the stalemate, offered to buy petitioner's interest in the Jumbos for $1,000,000. Desi treated this offer as an insult, told Harrison the Jumbos were worth $2,250,000, and offered to buy CBS's one-third interest for $750,000. Harrison indicated that he doubted CBS would be interested. A subsequent meeting between Desi and William S. Paley, Chairman of the Board of CBS, was no more successful. Subsequently, in the spring of 1961, Harrison informed Desi that CBS would be willing, in order to break the deadlock, to accept $750,000 for its one-third interest in the films. Petitioner's board of directors, however, was unwilling to make the purchase at that time because by then the programming *37 for the next regular season (1961-62) had already been completed and it was believed that petitioner had nothing to lose by waiting a few months to see if CBS would present any distribution plans for the following season. But CBS did not present any distribution plans for the Jumbos during the remainder of 1961. In late 1961, Don Sharpe, the personal television agent for Lucy and Desi and a profit participant in the 13 Jumbos, undertook to initiate discussions with sponsors to stimulate interest in the Jumbos. He carried on discussions with Benton & Bowles, an advertising agency for General Foods, which indicated a willingness to sponsor the Jumbos for the summer of 1962 at a licensing fee of $47,500 per show. Desi thought the price was much too low and would establish a ceiling for future rerun fees. However, in early 1962, he conveyed the offer to Harrison, who thought it was a good one. An argument ensued because of this difference of opinion. It resulted in Harrison again offering to buy petitioner's interest in the Jumbos, this time for $750,000. Desi was not satisfied with the offer but nevertheless relayed it to petitioner's board of directors. The board members, realizing *38 there was no longer any possibility of overcoming the impasse between petitioner and CBS, recommended acceptance of the CBS offer. In early March 1962, Desi conveyed the board's decision to Harrison but requested and received the right to an additional $500,000 of contingent purchase price to be payable only out of 50 percent of CBS's profits in excess of $1,000,000. from the future distribution of the films. A contract of sale of the 13 Jumbos, embodying the above terms, was executed on March 6, 1962. CBS subsequently concluded the deal with Benton & Bowles on its own. In its Federal corporation income tax returns, as adjusted after audit, for its 1958, 1959, 1960, and 1961 fiscal years, petitioner depreciated the costs of producing the 13 Jumbos by allocating such costs over the estimated gross income to be realized from the films. Respondent did not disturb the depreciation deductions claimed for the Jumbos in those years. As of the beginning of petitioner's fiscal year ended April 28, 1962, petitioner's adjusted basis for the 13 Jumbos was $314,567.13. For said fiscal year petitioner claimed $18,753.45 of depreciation of its basis for the 13 Jumbos. The same method of depreciation *39 was used by petitioner in its Federal corporation income tax return for its 1962 fiscal year and the estimated gross income to be realized was determined to be the actual receipts. Respondent disallowed all of the depreciation claimed with respect to the 13 Jumbos in petitioner's 1962 fiscal year return, the year in which the films were sold to CBS. In its 1962 fiscal year return, petitioner reported the gain realized on the sale of the 13 Jumbos as capital gain pursuant to the provisions of section 1231. Respondent determined that the gain was not subject to the capital gain provisions of section 1231. Ultimate Finding The 13 filmed television shows (Jumbos) sold to CBS on March 6, 1962, were not held by petitioner primarily for sale to customers in the ordinary course of its business. Opinion As to the principal issue, petitioner contends that the 13 Jumbos were not held by it primarily for sale to customers in the ordinary course of its business. In support of this contention petitioner stresses the following facts: (1) that during its 15-year history its sole purpose in producing and holding television films for its own account has been to license the films to networks *40 initially and to relicense them thereafter to local television stations in this country and throughout the world; (2) that its enormous financial commitment to developing new films for rental and the demands of its distribution organization clearly demonstrate that selling films is foreign to its operation; and (3) that, except for a 1956 sale as part of a stock redemption and the sale here involved, it has not sold any of its other television films. Moreover, petitioner further contends that the 13 Jumbos were produced and held by it for the same purpose it holds all its other films, and to the extent that Rev. Rul. 62-141, 1962-2 C.B. 182, is intended to describe what petitioner and similarly situated major television film producers do with their films, such ruling is contrary to the facts established in this proceeding. Respondent answers that the 13 Jumbos were held by petitioner primarily for sale to customers in the ordinary course of its business and that the gain realized from their sale should be taxed to petitioner as ordinary income. It is respondent's position that this case is controlled by Rev. Rul. 62-141, supra. We agree with petitioner. *41 We have found as an ultimate fact that none of the 13 Jumbos sold to CBS on March 6, 1962, were held by petitioner primarily for sale in the ordinary course of its business. Petitioner claims it is entitled, under the provisions of section 1231, to treat the proceeds of the sale as capital gains; while respondent argues that petitioner is precluded from treating such proceeds as capital gains by section 1231(b)(1)(B). Section 1231 provides that a taxpayer's gains and losses from the disposition (including voluntary conversion) of assets described in that section as "property used in the trade or business" and from the involuntary conversion of capital assets held for more than six months shall be treated as long-term capital gains and losses if the total gains exceed the total losses. Section 1231(b)(1)(B), which defines property used in the trade or business, is set forth in the margin. [2]
*42 The purpose for which petitioner produces and holds its property is a question of fact to be determined from the entire record. Hollywood Baseball Association 42 T.C. 234 (1964), affd. 352 F. 2d 350 (C.A. 9). This factual test has been applied in many cases. Various criteria deemed relevant include the nature of the taxpayer's business, the intent of the seller, the activity of the seller in promoting sales, and the volume, frequency, continuity, profitability and substantiality of the sales. We recognize that differences in circumstances often make some of the criteria more critical than others. Frank v. Commissioner, 321 F. 2d 143 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court, Meridian, Inc. v. Commissioner, 322 F. 2d 198 (C.A. 6, 1963), affirming a Memorandum Opinion of this Court; and Pool v. Commissioner, 251 F. 2d 233 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court, certiorari denied 356 U.S. 938 (1958). Petitioner, of course, has the burden of proof. Alice E. Cohn, 21 T.C. 90 (1953), affirmed 226 F. 2d 22 (C.A. 9, 1955). The nature *43 of petitioner's business is no mystery. The record shows that petitioner is in the business of producing television films for rental and renting its facilities and providing services to others. Renting films has been petitioner's business for over 15 years. It has been so successful that a subsidiary was formed to provide for world-wide distribution of its films. To satisfy the requirements of its customers, petitioner's prime purpose has been to enlarge the extent of its film library (and thus its rental capacity), not to deplete it through sales. Petitioner's only sales activities are the "selling" of licenses to use its films. Its entire distribution organization is devoted to licensing films. It was petitioner who arranged for the licensing of the 13 Jumbos for the first network run. However, since CBS held the distribution rights after the first network exhibition, the distribution organization of petitioner could not undertake to arrange for the relicensing of the films. Nevertheless, as the testimony so cogently indicates, petitioner engaged in long and difficult negotiations with CBS in an effort to have the Jumbos relicensed. It was only after reaching an impasse in negotiations *44 with respect to the relicensing of the Jumbos that petitioner finally agreed to sell its rights therein. A comparison of petitioner's rental income with its sales income is likewise significant. In the past ten years petitioner has grossed more than $60,000,000 from the rental of its films and more than $98,000,000 from the rental of its facilities. The Jumbos grossed approximately an additional $5,000,000 in licensing income for their first network runs. By comparison the sale of the Jumbos brought a gross of $750,000. [3] Petitioner also realized about $4,300,000 from the 1956 sale made as part of the redemption of CBS's 24 percent stock interest in petitioner. Not only is the evidence convincing that CBS would not have agreed to the redemption of its minority interest without the concomitant sale, but respondent ruled on February 11, 1957, that the transaction was subject to the capital gain provisions of section 1231. In our opinion two isolated "forced" sales are insufficient to justify a conclusion that petitioner holds its own films primarily for sale in the ordinary course of its business. *45 The intent of petitioner is of prime importance in cases such as this. We think petitioner's intent, with respect to all of the films it has produced for its own account, has been to realize rental income through licensing. Respondent's rather obtuse argument that petitioner had a covert, recondite intent to sell all films produced with the "Lucy-Rickey" characters is based on innuendo not fact. We find no evidence of surreptitious dealings and obscure purposes. Suffice it to say that the Court was impressed by the apparent veracity of petitioner's witnesses and we have no reason to doubt their testimony. Contrary to respondent's assertion on brief, we believe it would be the height of naivete to assume that any person in the business of renting property does not realize that at some point he may have to sell some of it, be it to raise funds to expand his operation or purchase newer rental property, divest himself of outmoded rental property, or to pay his just debts. The recognition of this possibility is a far cry from harboring an outright intent to sell. Respondent relies on Rollingwood Corp. v. Commissioner, 190 F. 2d 263 (C.A. 9, 1951), affirming a Memorandum *46 Opinion of this Court; Malat v. Riddell, 347 F. 2d 23 (C.A. 9, 1965), certiorari granted November 8, 1965; and Rev. Rul. 62-141, 1962-2 C.B. 182. Rollingwood Corp v. Commissioner, supra, involved the construction of 700 single family dwellings in Richmond, California, during World War II. David Bohanon, who formed Rollingwood, had been, prior to this project, in the business of subdiving and selling real property and constructing homes. At the outbreak of World War II he disbanded his sales force and devoted himself to war housing projects. Bohannon received priorities to obtain building materials for 700 homes by applying to the National Housing Administration and the War Production Board. He caused Rollingwood to be incorporated and transferred the applications for priorities and commitments to it. Certain conditions were imposed on Rollingwood by virtue of these commitments and priorities. Among them were the following: all of the houses had to be rented with a 30-month option to the tenant to purchase; the tenant could not be obligated to purchase; if the tenant exercised the option all prior rental payments were to be credited against *47 the purchase price of the house; and the purchaser was to assume the unpaid balance of the F.H.A. loan on the property. Rollingwood never employed a sales force or put up any "for sale" signs. The 700 houses were completed by August 14, 1943. By May 31, 1947, Rollingwood had sold 801 houses. The total number of houses sold exceeded the number of houses constructed because 81 had been reacquired by repossession and 24 by repurchase. Of the 801 sales, 504 were made to non-tenants. In its 1944 income tax return Rollingwood was described as being in the business of "Development of subdivision and selling of homes to defense workers." In its 1945, 1946, and 1947 income tax returns, Rollingwood was described as being in the business of "Development of subdivision - renting and selling homes." The above facts hardly need discussion. Rollingwood was set up to sell or rent; its dual purpose was properly described on its income tax returns. The mere fact that all the houses had to be rented first is not at all inconsistent with a purpose to sell, especially in view of the number and frequency of the sales. As the Court of Appeals said at page 266: The test normally applied in these situations *48 is the frequency and continuity of the transactions claimed to result in a trade or business. n3 Applying that test to the facts in the instant case we have no difficulty in finding support in the record for the finding that Rollingwood is in the business of selling real property. n4 [Footnotes omitted.] The Court also noted that the large number of sales "to persons who did not have rental-option agreements or to whom Rollingwood was under no obligation to sell is very persuasive evidence of the purpose for which the houses were held." With Rollingwood compelled to sell to any tenant who properly exercised his option, a finding that it was not in the business of selling would have been contrary to fact. A basic purpose to sell, a great volume and frequency of sales and a tacit admission of being in the business of selling are not the same facts we have before us here. Malat v. Riddell, supra, involved the purchase of 44.901 acres of farm land by a joint venture. The intent of the joint venturers was to have the land rezoned residential and develop the entire property as a garden-type apartment development which would require no division of the property into separate *49 parcels. The joint venturers were unsuccessful in obtaining financing, abandoned their original idea of a single mortgage project and decided to construct individual apartment buildings, each one with a separate mortgage. This plan involved carving out about half of the property for construction of the buildings, retaining the rest of the acreage, two parcels which fronted on streets, for commercial use. The joint venturers failed to get the two outside parcels rezoned for commercial use and were also unsuccessful in obtaining financing. They proceeded to sell the subdivided inner lots and reported their gain as ordinary income. The front parcels were retained in the hope of obtaining rezoning but a rift developed between the joint venturers. Those who wanted to get out sold their interests, reporting their gain as capital gain. Although the taxpayer maintained that the joint venturers had never contemplated selling the two front parcels until the rift between them developed, the District Court found that the front parcels were held for the dual purposes of development for the production of income or sale. Particularly convincing to both the District Court and the Court of Appeals *50 was testimony by the taxpayer that the joint venturers realized at the beginning that they might be unsuccessful in obtaining the necessary rezoning or financing but, "we felt that we had made a good buy on the property as far as price is concerned, so that if we couldn't do anything in the way of zoning, we would sell the whole thing off in bulk. We wouldn't get hurt." (347 F. 2d at p. 25.) The Court of Appeals hypothesized two possible situations; one where property was acquired solely to develop for rental purposes, no other method of recognizing gain from the property was contemplated, this purpose failed and there was a sale of the property; the other where property was acquired to realize gain in any feasible manner and one or more prospects failing, gain was eventually realized by sale which was one of the contemplated alternatives at the time of purchase. The Court would allow capital gains treatment for the first sale but not the second. In its analysis of the Malat case, the Court of Appeals said at page 27: Certainly it may be said (as the District Court in effect has said) that the purpose of the acquisition encompassed all of the steps which were successively *51 taken, and that the primary purpose of the holding touched on each in turn. Sale, then, was not the liquidation of an investment. It was the final alternative in taxpayer's continuing efforts to realize gain from his acquisition. It was part of his plan rather than the abandonment of it. There is no doubt in our minds that the instant case fits into the Court of Appeals' hypothesis of a proper capital gains situation. It is clear that petitioner was not operated with a dual purpose. The totality of petitioner's activities belies any intent to realize gain through sales. The sale to CBS was anything but a part of petitioner's plan; rather it was the complete abandonment of a plan. Respondent emphasizes that petitioner passed up an opportunity to purchase all of CBS's rights in the Jumbos; and that if petitioner really desired to implement its avowed purpose to rent the Jumbos it would have made the purchase and distributed the films itself. Under the circumstances existing at that time we think the decision of petitioner to reject the CBS offer was reasonable. There is no proof that the offer was continuing or later renewed. Important, too, is the fact that the Jumbos had become a *52 bone of contention between CBS and petitioner and the major purpose of the sale was to remove the cause of connection between the two corporations. Thus, as we view it, petitioner abandoned its plan and liquidated its investment. Finally, respondent argues that Rev. Rul. 62-141, supra, is squarely in point and controls this issue. We disagree. A revenue ruling does not have the force and effect of Treasury Regulations. It merely represents the opinion of the Internal Revenue Service as to the application of law to a particular state of facts; and it is not binding on this Court. See Miners National Bank of Wilkes-Barre, 33 T.C. 42, 45 (1959); and New England Furniture and Carpet Co., 9 B.T.A. 334, 337 (1927). However, since respondent relies so heavily on the ruling, we feel compelled to discuss it. Cf. Henry C. Beck Builders, Inc., 41 T.C. 616 (1964), Wilkes-Barre Carriage Co., 39 T.C. 839 (1963), and Denver & Rio Grande Western Railroad Co., 38 T.C. 557 (1962), where revenue rulings were discussed in detail. *53 The revenue ruling begins by quoting the language in Roolingwood Corp. v. Commissioner, supra, which accepts respondent's contention in that case that the word "primarily" means "essential" or "substantial" rather than "principal" or "chief" as contended by the taxpayer. Some courts have followed this means of analysis while others have not found it necessary or helpful to draw the distinction. See Recordak Corp. v. United States, 325 F. 2d 460 (Ct. Cl., 1964). We find it unnecessary to enter this semantical arena because, in our judgment, the petitioner did not have a principal, chief, essential or substantial purpose to hold the Jumbos for sale to customers in the ordinary course of its business. The revenue ruling next quotes the language in Rollingwood which properly states that if a taxpayer holds property for the dual purpose of rental or sale, whichever proves to be more profitable, it would be contrary to legislative purpose to allow capital gains treatment. To support respondent's preferred definition of "primarily," the revenue ruling next cites S.E.C. Corp. v. United States, 140 F. Supp. 717 (1956) affirmed per curiam, 241 F. 2d 416 *54 (C.A. 2, 1957), certiorari denied 354 U.S. 909 (1957), involving electric water and food coolers, and Greene-Haldeman v. Commissioner, 282 F. 2d 884 (C.A. 9, 1960), affirming 31 T.C. 1286, which concerned the sale of rental cars by dealers, where the Court of Appeals said at page 888: In Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, at page 52, 76 S. Ct. 20, at page 24, 100 L. Ed. 29, the Court indicated that a narrow construction should be given to provisions of the Code which authorize capital gain treatment. If we were to accept the taxpayer's contention we would of necessity be expanding the types of transactions which are entitled to capital gain treatment. The Courts have universally adopted the Corn Products precept of narrow construction of the capital gains provisions and have applied it in numerous cases, some of which have produced seemingly irreconcilable results. This is not too surprising because the Supreme Court's statement of general policy must be applied, ordinarily, to factual cases. However, there is one thing we do know - the Corn Products decision has not increased a taxpayer's burden *55 of proof in such cases but has merely laid down a general guideline for statutory construction. In both S.E.C. Corp. v. United States, supra, and Greene-Haldeman v. Commissioner, supra, sales activity was great and sales were frequent. These cases merely indicate that there is no particular magic in renting property before selling it and both find, on their facts, that sales were an integral part of the everyday activity. Neither case purports to deny that under proper circumstances, such as we have here, a rental business can sell some of its property and realize capital gains. The revenue ruling then goes on to say, at page 184: In view of the fact that television film producers are aware of the market that exists for sales of television films after initial leasing periods, it is reasonable to assume that generally, from the time of their production, a producer's intention is either to sell, to rent, or to rent and then sell, whichever method proves most profitable in its business. Under the rationale of the cases referred to above [S.E.C. Corp. v. United States and Greene-Haldeman v. Commissioner], the fact that the films were leased prior to *56 sale would not prevent their being held "primarily" for the purpose of sale, within the meaning of section 1231(b)(1)(B) of the Code. While we agree with the conclusion stated in the second sentence and agree that television producers are probably aware of the market that exists for the sale of their product, we believe it is unreasonable to attribute a general purpose to sell to the entire industry. Everyone who enters the rental business must be aware that in most cases there is a market for the sale of his product or equipment. However, to impute a purpose to sell because of this awareness is like diagnosing an infirmity without checking the symptoms. Decisions of this nature simply cannot be made in vacuo. Respondent's major premise is that sales of television films are profitable while its minor premise is that all television producers desire to make a profit. The conclusion respondent draws from this is that all television producers intend to sell. Respondent has committed the elementary error in logic of the "undistributed middle." The revenue ruling then cities Joseph A. Harrah, 30 T.C. 1236 (1958), for the proposition that, if the producer has no intention *57 to sell, he may develop a substantial intent to sell by the time of sale. The Harrah case involved a taxpayer who was in the business of constructing sawmill plants and equipment and selling them in the ordinary course of its business. It constructed an experimental portable sawmill for test purposes but was approached by a purchaser prior to completion. Not knowing the value of the sawmill, the taxpayer and the purchaser executed a one-year lease with an option to purchase. The option was exercised after 9 months and the taxpayer reported capital gain which was disallowed by the Commissioner. In sustaining the Commissioner's determination, we found that from the time the leaseoption agreement was executed, the property was held for a second purpose, i.e., for sale, because "[the] option to purchase constituted a continuing offer on the part of the corporation to sell the property." Although the taxpayer may have had no intent to sell prior to granting the option, the purpose of holding was obviously expanded. It is axiomatic that nobody sells without an intent to sell, but it is the nature of the impetus to sell and the degree of sales activity that control. To hold property for *58 sale in the ordinary course of business requires a reasonably free choice to do so, manifested by substantial selling activity. The exigencies of business sometimes require one to turn, to some extent, to selling activities. But there is still the free choice of going into the selling business or merely liquidating one's investment. What choice has been made can be ascertained from the degree and nature of sales activities, the number and frequency of sales and the length of time over which they are made. Reference is next made to Clifford Goldsmith, et al. v. Commissioner, 143 F. 2d 466 (C.A. 2, 1944), affirming 1 T.C. 711 (1943), certiorari denied 323 U.S. 774 (1944), which held that payments for the exclusive motion picture rights in a play were not capital gain. A concurring opinion expressed the belief that the taxpayer was in the business of exploiting and selling rights to his play, that the copyright and literary property were held for sale in the ordinary course of business, and that the sums were therefore received in the ordinary course of that business. Even though the taxpayer had written only one play, he had spent his time *59 successfully exploiting it in various ways. Also cited is Joseph A. Fields v. Commissioner, 189 F. 2d 950 (C.A. 2, 1951), affirming 14 T.C. 1202 (1950), which followed Clifford Goldsmith on similar facts. However, the revenue ruling ignores the following language of Joseph A. Fields, at page 951: The contention that the motion picture rights were not held primarily for sale in the ordinary course of trade or business is without merit. The petitioner is a playwright, not a theatrical or motion picture producer or a publisher. The only way in which he could realize income from his copyrighted works was to license or sell to others the right to publish, stage or produce them. * * * The inference readily drawn from such language is inconsistent with respondent's theory of the present case as well as Rev. Rul. 62-141, both of which involve producers. The ruling, immediately following the citation of Goldsmith and Fields, states Similarly, the business of television film producers also embraces exploiting of the films through whatever methods are within their reasonable contemplation at the time of production or at a later time. This language *60 seems unwarranted in view of the above-quoted language in Fields, written by the same court that wrote Goldsmith which held the taxpayer to be in business as a playwright. Thus the two cases fail to support the respondent's conclusion. We think respondent's revenue ruling not only has no application to petitioner in the light of the facts established in this proceeding, but also reaches an incorrect conclusion. Each case involving the question of whether property is held primarily for sale to customers in the ordinary course of business must be decided on its own facts. Respondent, by his revenue ruling, has ignored this basic principle and has attempted to dispose of most, if not all, of the cases that may arise from the whole television film producing industry. It is abundantly clear that not a single one of the hallmarks of holding property primarily for sale to customers is present in this record. The overwhelming weight of the evidence causes us to conclude that the petitioner did not hold the 13 Jumbos for sale at all, but held them, as it has held its other films, for the single purpose of licensing them indefinitely for exhibition on networks and local television stations *61 throughout the United States and the world. As to the second issue, petitioner contends that it is entitled to a depreciation deduction with respect to the Jumbos in the year of their sale, irrespective of the fact that the purchase price which it received from the sale of the Jumbos exceeded its adjusted basis in the films. Respondent contends that it is proper, in computing the deduction for depreciation of an asset, to adjust salvage value at or near the end of the useful life of an asset where there is a difference between what was estimated and what salvage value as shown by actual sale of the asset proves to be. Respondent further contends that the deduction for depreciation in the taxable year of the sale of an asset used in the taxpayer's trade or business may not exceed the amount by which the adjusted basis of the asset at the beginning of the year exceeds the amount realized from the sale. Petitioner determined its depreciation deductions for the Jumbos pursuant to the "income forecast" method set forth in Rev. Rul. 60-358, 1960-2 C.B. 68, as directed by respondent's agent. Prior to petitioner's 1962 fiscal year, respondent did not disturb petitioner's *62 depreciation deductions with respect to the Jumbos. For its 1962 fiscal year petitioner again claimed depreciation on the Jumbos under the same method, but this time forecast the income to be realized by utilizing actual gross receipts from the films instead of estimated receipts. Respondent, in disallowing the 1962 depreciation deduction, relies on Fribourg Navigation Co., Inc. v. Commissioner, 335 F. 2d 15 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court, certiorari granted February 1, 1965; United States v. The Motorlease Corp., 334 F. 2d 617 (C.A. 2, 1964), reversing 215 F. Supp. 356 (D.C.Conn., 1963), certiorari applied for November 13, 1964; and Cohn v. United States, 259 F. 2d 371 (C.A. 6, 1958). We have recently rejected respondent's argument in Macabe Co., 42 T.C. 1105 (1964), and Harry Trotz, 43 T.C. 127 (1964). We stated in Macabe Co., supra, at pages 1111 and 1112, that, "where depreciable real property is unexpectedly disposed of substantially prior to the expiration of its estimated useful life, the actual sales price received therefor bears little, if any, *63 relevance to the salvage value of the property," the sole exceptions to this rule being where the property is sold at or near the end of its useful life, Cohn v. United States, supra, at p. 378, or where it appears that there has been an error in the taxpayer's original calculation of salvage value, Massey Motors v. United States, 364 U.S. 92, 105 (1960). Here, petitioner has consistently claimed depreciation deductions according to estimates whose propriety is not in question. An unplanned sale yielded proceeds in excess of the adjusted basis at the beginning of the year of sale. The depreciation deduction is the amount which should be set aside for the taxable year in accordance with a reasonably consistent plan, so that the aggregate amounts set aside, plus the estimated salvage value, will at the end of the property's useful life equal the cost of the property. Section 1.167(a)-1(a), Income Tax Regs.
Where respondent, in disallowing a depreciation deduction, has not challenged the taxpayer's estimates of useful life and salvage value, determined at the time the property is acquired, and has not questioned the taxpayer's *64 method of depreciation, or its consistency in adhering to that method, but has merely asserted that the sales price exceeded the property's adjusted basis at the beginning of the year of sale, he cannot prevail in this Court. Macabe Co., supra. See also United States v. S & A Company, 338 F. 2d 629 (C.A. 8, 1964), affirming 218 F. Supp. 677. Petitioner is entitled to its depreciation deduction for its 1962 fiscal year, under the method it has consistently followed, against the licensing income derived prior to the date the property was sold. To reflect certain agreements of the parties, Decision will be entered under Rule 50. Footnotes
1. All section references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) * * * (b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not - (A) * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩
3. Petitioner may receive an additional $500,000 of purchase price out of 50 percent of CBS's profits from the 13 Jumbos in excess of $1,000,000. Such additional purchase price, of course, is payable only if, as and when CBS realizes its $1,000,000 profit, a contingency which had not yet occurred at the time of trial, May 7, 12, 13, and 14, 1965.↩